```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION
                                      .
 3   IN RE:  AREDIA & ZOMETA          .
     PRODUCTS LIABILITY               .
 4   LITIGATION                       .    Civil Case # 3-06-01760
                                      .    (Internal use only)
 5                                    .    June 29, 2006
     ..........................
 6

 7

 8                  TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE JOE B. BROWN
 9

10

11
     APPEARANCES:
12
     For the Plaintiffs:          Fred Dulin Kelly,
13                                C. Patrick Flynn,
                                  Bart T. Valad,
14                                John Vecchione,
                                  Daniel A. Osborn,
15                                Russel H. Beatie,
                                  John O. Threadgill,
16                                Michael K. Radford,
                                  Robert W. Briley &
17                                Robert G. Germany,
                                  Attorneys at Law
18

19

20   For the Defendants:          Katharine R. Latimer &
                                  Heather A. Pigman,
21                                Attorneys at Law

22

23

24   Official Court Reporter:     John W. Tummel, RPR
                                  801 Broadway, Rm. A-839
25                                Nashville, Tn. 37203
```

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 1 of 87 PageID #: 459

1          THE COURT:  All right.  Well, I guess
2  this is our first meeting in what will probably be
3  several.  Let me kind of make sure I have -- the role of
4  the defendant is pretty easy.  You two are over there.
5  The plaintiffs side, I have got the pleadings from the
6  three groups.
7          You all indicated you represented, I
8  think, 66 out of 68.  I need to check which two you all
9  are not involved in and see if somebody is here from
10  those two.
11          Can somebody help me out?
12          MR. BRILEY:  Rob Briley of the Nashville
13  Bar.  I am here in what I believe is the last case
14  removed, Simmons, James and Clarice.  It was filed in
15  state court in Maryland.
16          THE COURT:  Okay.
17          MR. BRILEY:  I believe I am the only one
18  here on that case.
19          THE COURT:  Let me see the number of
20  that one.
21          Do you know what number has been
22  assigned here?
23          MR. BRILEY:  I believe 0551.
24          THE COURT:  Okay.
25          MR. BRILEY:  Roy Mason and Pam Diedrich

1  will be primarily responsible for the case.

2              THE COURT:  Right now you're not --

3              MR. BRILEY:  I am the lone wolf in the

4  corner.

5              MR. KELLY:  Your Honor, Dulin Kelly.

6              I want to aid you in the last case.  We

7  know that was brought by the Charlie law firm in

8  Oklahoma.  We are not able to identify for Your Honor

9  this morning the number of that case.

10              Ms. Latimer might but we don't --

11              THE COURT:  Okay.  As far as I know, I

12  haven't heard anything.  I was wanting one attorney

13  for everybody here.  I guess they waive their seat at

14  the table.

15              On the defendants' side, do you know

16  which case that is?

17              MS. LATIMER:  I believe it is -- I don't

18  have a docket number nor the individual case.  I believe

19  it is Ingram, I-n-g-r-a-m.

20              MR. KELLY:  She is right.  00394.

21              THE COURT:  So, there is no one here

22  representing the plaintiffs in the Ingram case?  All

23  right.

24              The other one is the 551 case.  We have

25  one case not represented.  All right.

1          Let's kind of work our way through this
2     a little bit.  This is the first one of these MDLs I
3     have handled.  I suspect it will be a little learning
4     experience for everybody.
5          I am an old country boy.  I try to cut
6     to the chase sometimes on this and, hopefully, we will
7     all get through it and see where we come out at the
8     end.
9          Let me take a little quick look at what
10    I have as pending motions.  Now, one case -- I think
11    it came in a motion to withdraw certain motions, to
12    withdraw certain objections to certain motions.  I
13    love the titles on these sometimes.  It doesn't really
14    indicate what case it was in.
15         Then I had the motions in the three
16    Nashville cases that were for joinder, to join spouses,
17    substitute parties because of some deaths.
18         I believe we had a telephone call about
19    that one and were hoping to perhaps resolve that.  Those
20    are mostly in 16, 18 and 19.
21              MR. GERMANY:  Rob Germany.
22         We filed a joint motion with Novartis to
23    withdraw the motions and various objections.
24              THE COURT:  That is the one that doesn't
25    have a docket number.  I will have to dig it out.  I

1    haven't acted on that one yet.

2                    MR. GERMANY:  I haven't seen an order

3    yet.

4                    MS. LATIMER:  I don't believe there was

5    an order but we resolved the issues between us.  It

6    was all to be resolved by consent.  There are some

7    things outstanding yet.

8                    THE COURT:  This electronic filing and

9    everything, given the number of cases, what I try to do

10   when I see something pending, I want to do something

11   with it because it is real easy with this many motions

12   to kind of have it drop through the cracks.

13                   We had a telephone conference.

14                   MR. GERMANY:  Yes.

15                   THE COURT:  This motion to withdraw

16   certain motions doesn't have a docket entry.  I will

17   have to check with the docket clerk.  That was going to

18   resolve a lot of those situations.

19                   Part of that was getting the paperwork

20   together to substitute for individuals that had died in

21   the interim.

22                   MR. GERMANY:  Subject to the Court's

23   approval the joint motion we submitted should resolve

24   all pending issues in the three original Nashville

25    cases.


                                                    6
1                    THE COURT:  Okay.  I am sure someone has

2     an extra copy.  I am sure it is in the computer.  I

3     thought I remembered it but I don't have it in front of

4     me.

5                    That took care of the original cases.

6                    There was a motion to amend the complaint,

7     to strike.  That motion takes care of all that.  That

8     was the amended complaint in 16, 18 and 19.  That took

9     care of that.

10                   On Judge Campbell's rooster there is a

11    motion to dismiss that related to 497.  That was pending

12    when it came down here.  I believe in that case I

13    allowed an amendment.  That has a lot of issues between

14    New Jersey and North Carolina, I think.

15                   Is that motion dismissed or is it still

16    valid?

17                   MR. VALAD:  Bart Valad.  Good morning.

18                   Our view was in view of Your Honor's

19    granting the motion to amend, the plaintiffs' view is

20    it was likely mooted.

21                   THE COURT:  I can term that as mooted.

22    Forty eight is the moot.

23                   It really looks like now, probably for
                              Page 6

24    the last time in a long time, we don't have much pending
25    as far as motions.

1                What we need to do is try to get a
2    scheduling order, initial plan, whatever, and both
3    sides have given me some suggestions that I have gone
4    over.  It looks to me like, certainly, they are ideas
5    and matters we should discuss.  I know there is some
6    discovery issues that are going to come up.
7                Somebody already mentioned one point
8    seven million documents, 450 boxes or so.  I know we
9    will get into that.
10               I know also we have some issues that
11   will come up of discovery, how broad it is.  We have
12   some class issues.
13               There was some mention on the plaintiffs'
14   side about what Judge Campbell would think about the
15   Fosamax litigation coming down here.
16               I think his view is that is for the MDL
17   and he is not volunteering.  If it is assigned that is
18   one thing but he is not volunteering.  I think I second
19   him on that.
20               In that connection if the Fosamax, by
21   some stretch, did come down here, I know some of the

22  plaintiffs' attorneys are involved in that litigation.

23                 Is there going to be requests in that

24  case for some monitoring of the class, or something of

25  that nature?

1                 MR. KELLY:  Yes, sir.

2                 THE COURT:  I don't know if that causes

3   a problem for me.  My wife has taken Fosamax for years.

4   I don't know whether that would get me into a conflict

5   or not.  It is one of those things.  That is just a

6   problem, because that would be a fairly wide class,

7   particularly among older judges or their spouses that

8   may be involved in that.  That is a pretty widely taken

9   medication.

10                To what extent that causes a conflict,

11  I don't know.  We are not on that bridge yet.  I will

12  have to cross that one, maybe.  That is something to

13  keep in mind.

14                Judge Campbell is not volunteering.

15  That is a matter for the MDL panel, where they want to

16  put it.  I assume they communicate with the judge on

17  that.

18                That will take care of that issue.

19                Now, who wants to go first as to some

20  suggestions?

                        Page 8

21          What I would like to do ideally coming

22  out of here is have a pretty good understanding where

23  we are going with this matter and get discovery underway

24  and take a look at some trial dates.

25          Judge Campbell originally set trial

9

1   dates in the three cases filed in this district, and I

2   think the view was with MDL those dates weren't

3   considered set in stone at this point.  He would like

4   to get -- and I intend to get it if I can -- a target

5   trial date the three cases filed here would be set for

6   trial.

7           If there are any other cases where the

8   parties consent to trial here then those could be set.

9   I don't think we need to reach a decision on that

10  today.

11          Clearly at some point some of the cases

12  will have to be tried.  I think the view is we might as

13  well try them here first since we will have most of

14  them going at that point.

15          At some point the parties will have to

16  talk about settlement and resolution and whether it

17  needs a couple cases tried.

18          The parties -- it may be they want to

Page 9

19 pick one or two or three or four test cases and see
20 what happens.
21          Hopefully the case can be settled at
22 some other point.  My multi-district book says try to
23 raise settlement and push it.  I will try that at
24 another time.  I suspect as we sit here today it is way
25 too early.

                                                        10

1          I know the plaintiffs indicated there
2 may be other cases filed.  One of the suggestions was
3 that the cases be filed -- an order to direct the cases
4 be filed directly here that would kind of, in effect,
5 bypass the MDL panel.
6          As things get down the road, they can
7 be consented to proceed here or remanded back to a
8 district that has unquestioned venue.
9          I believe you indicated the judge in
10 Louisiana had put down such an order.
11          I would probably like to see a copy of
12 that if we go that way.
13          You indicated a number of state court
14 cases pending in New Jersey; because of lack of
15 diversity is up there.
16          There might be a need to coordinate with
17 state court judges and make sure that we don't have

18  discovery that is duplicated; what is good here is good

19  there, et cetera.

20          I am certainly more than happy to

21  communicate with state court judges on the matters and

22  coordinate with them to the extent possible.  I think

23  that make sense.  There is no sense having courts going

24  in different directions.  Federal is going to be under

25  MDL here.  It seems if we can coordinate as much as we

11

1  can in the state court cases -- from the plaintiffs'

2  side or defendants', do we have some separate counsel

3  separate from here or does the group of three of you got

4  your oars in the water, too?

5          How does that go?  Who is kind of the

6  lead spokesman?

7          MR. KELLY:  Yes, sir.  We don't have any

8  interest, our group, in the New Jersey cases, if that is

9  what Your Honor is asking.

10          THE COURT:  Somebody is stepping up.

11          MR. VALAD:  Bart Valad again.

12          I currently have claims on behalf of

13  seven plaintiffs pending in New Jersey.  Additional

14  claims will be filed in the New Jersey court.  At

15  present, three cases with multiple plaintiffs in each

Page 11

16   case.

17                The coordination with the state court

18   cases are very important.

19                THE COURT:  How far along is the case?

20   Give me a thumbnail where they are.

21                MR. VALAD:  Really at the beginning.

22   There have been multiple discussions and some

23   disagreement with Novartis.  We have agreed to

24   everything with exception of sharing.

25                Their position is I would need to

1   discover from them in three separate cases.

2                I think there will be motions absent

3   something from this Court.

4                THE COURT:  Are all the cases assigned

5   to one judge?

6                MR. VALAD:  They are three different

7   courts in three different counties.

8                THE COURT:  Okay.  They will stay that

9   way as far as you know?  There may not be a provision

10   with county --

11                MR. VALAD:  There has been a motion

12   pending from Novartis to separate out the cases.  We

13   are waiting for a ruling.

14                THE COURT:  Okay.

15                    MS. LATIMER:  Your Honor, to follow-up.

16    There is only --

17                    THE COURT:  I am sorry.  I missed your

18    name the first time.

19                    MS. LATIMER:  Kate Latimer for Novartis.

20                    There are only five cases with a total

21    of eight plaintiffs pending in state court.  Those are

22    in New Jersey.  There are no other state court actions.

23                    Mr. Valad has roughly half the cases and

24    the majority of the plaintiffs there.

25                    THE COURT:  As a practical matter, I

1    assume if they are filed outside New Jersey you would

2    be removing those to federal court?

3                    MS. LATIMER:  Yes.  There only has been

4    one case we had the -- mostly they have been filed in

5    federal court and the doctors, prescribing doctors have

6    not been named as co-defendants.

7                    There hasn't been an issue with removals

8    or remands.

9                    THE COURT:  Okay.  Let's start down the

10    road to what we do with the scheduling order and things

11    in this case, confidentiality orders and everything

12    else.

13              I don't know whether anyone has a

14   particular plan.  I've got, obviously, the submission --

15   conference agenda.  I am looking to come out with an

16   order today and getting some stays.  We stayed discovery

17   up through today.

18              My proposal is it will be lifted at the

19   end of the day so we can get on with it.

20              MR. KELLY:  May I speak to the first

21   problem?

22              THE COURT:  Somebody has to start.

23              MR. KELLY:  We have looked at the

24   suggested agenda by Novartis.

25              THE COURT:  Their's was a little shorter.

1               MR. KELLY:  Yes.  We don't have any

2    particular problems with anything except 1-E.

3               THE COURT:  Let me get down to the

4    documents.  They are short except for the certificate

5    of service.

6               I am looking at Novartis' docket number

7    64.

8               MR. KELLY:  They say they would like to

9    stay discovery of non-class certification discovery

10   during the resolution of the class certification issues.

11              We very much oppose that.

12        I might tell the Court and Ms. Latimer

13  and her team we are considering what to do with the

14  request for class certification for the personal injury

15  claims, thinking they may not be mature.

16        THE COURT:  I will have to say,

17  obviously, that decision is above my pay grade.  That

18  is for Judge Campbell.

19        I would be somewhat surprised if you got

20  class certification on the injuries.  Those really, to

21  me, are inherently different; different doctors and

22  different treatments.  I would be somewhat surprised if

23  you got class certification on the injury part of it.

24        Now, the other class issue that seems to

25  me that is in there is the issue about the dental

15

1  monitoring, or some of that.

2        MR. KELLY:  Yes.

3        THE COURT:  That may be a horse of a

4  different color.

5        MR. KELLY:  I wanted to tell you that,

6  and the team for Novartis right now, we are considering

7  withdrawing that request for class certification.

8        I also want Your Honor to know -- you

9  may know already -- that our group is the only group of

Page 15

10  all the plaintiffs that I know of who have asked for

11  class certification of any kind.

12          THE COURT:  I kind of looked through,

13  but you were one of the earliest cases.

14          MR. KELLY:  That's correct.  So it would

15  be, to me, to be unfair to all the other plaintiffs and

16  their counsel to stay discovery of anything except class

17  certification issues as well.

18          We certainly could never address the

19  preemptive issues that Novartis raised without full

20  and complete discovery as well.

21          While I am up here, judge, with regard

22  to discovery, having personally participated in going

23  to Washington and being confronted with 440 banker's

24  boxes of documents, I want to kind of describe them to

25  you.

1          They were put in banker boxes stuffed so

2  tightly in there that you had almost had to get a pair

3  of tweezers to get them out.

4          When I asked for the index so we might

5  have a concept of what to look for, they said there

6  wasn't one.

7          I think in any MDL litigation the Court

8  would be interested in having a repository so all

```
 9   counsel could have equal access.  I can't imagine
10   Novartis with 20 plaintiff lawyers coming up there at
11   all times looking for documents.
12                    They are on discs, we believe,
13   electronically stored.
14                    We believe we should be provided with
15   an index that could be word searched as well.
16                    I don't think we can get started
17   anywhere until that has been accomplished in some
18   fashion.  Because it is totally unworkable the way it
19   is now.
20                    THE COURT:  Ms. Latimer, probably the
21   best thing to do is to take it in small chunks.
22                    MS. LATIMER:  Okay.
23                    THE COURT:  He has his opening gun there.
24                    MS. LATIMER:  Let me respond to those
25   chunks.
```

```
 1                    Our suggestion that we have a stay of
 2   the individually filed cases pending resolution of the
 3   class is purely one of efficiency.  If in fact there
 4   were going to be a class certification ruling which
 5   we -- as Your Honor's comments suggested -- we very
 6   much believe there could not be a personal injury class
```

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 17 of 87 PageID #: 475

7    here.

8              If there were all the plaintiffs' whose

9    cases are pending would be included in the class unless

10   they opt out.

11             I didn't want to go through the effort

12   of unnecessary discovery in depositions while that was

13   pending.  If they are going to withdraw that request, I

14   don't have any interest in the stay.

15             I don't know how to respond.  At the

16   moment there is a request for -- request for a personal

17   injury class pending.

18             THE COURT:  I am not too worried about

19   it, quite frankly.  It sounds like they might withdraw

20   it.

21             My own view is -- I don't speak for

22   Judge Campbell, obviously, his decision -- but I would

23   be very surprised if it ended up getting granted.

24             It does indicate -- there may be some

25   indication that there is more interest in a class that

18

1    would deal with the dental monitoring issue at a later

2    date.  That would involve people, as I understand it at

3    the present time, that don't have active symptoms.

4              That is to me a bit of a different

5    class.

 6              MS. LATIMER:  I agree with that

 7    completely.  To my knowledge that case isn't pending.

 8              All the plaintiffs that have cases

 9    pending of personal injuries, diagnoses to my

10    knowledge --

11              THE COURT:  I thought I read in some of

12    the claims that somebody had put that in as a request.

13              MS. LATIMER:  There is a discussion about

14    that as central relief and this is where the litigation

15    may lead.

16              As the cases are completed, I am not

17    aware of a plaintiff with that claim.

18              MR. GERMANY:  Bob Germany.

19              The way it is pled, you wouldn't be on

20    notice it is but there is a Mr. Willard who doesn't

21    this.  I think that speaks to what Mr. Kelly spoke to

22    earlier, how we are considering streamlining the

23    process.

24              We intend to send a letter proposing

25    certain amendments to Novartis to see if we can reach

                                                            19

 1    an agreement on that.

 2              THE COURT:  Okay.  My view on that is --

 3    and it would be my decision that we are not going to

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 19 of 87 PageID #: 477

4   stay discovery on these nine class certifications.  I

5   think we might as well get on with that.  I think it is

6   going to be withdrawn or denied, and I will proceed on

7   that assumption.

8            That being said -- you are up.

9            MS. LATIMER:  I will take another chunk,

10  Your Honor.

11           With respect to the comments to

12  preemption briefing, the reason we raise that right

13  now in our agenda is because it is our view that ought

14  to be considered as a purely legal issue.

15           Although I have no intention of

16  requesting a stay of the ordinary work up of the cases

17  while that is pending, it is not a motion I think ought

18  to be put off until the very end as in typical summary

19  judgment motions.

20           THE COURT:  Preemption -- my prior

21  background, if you haven't looked me up -- and I kind of

22  expect everybody did -- I was a criminal lawyer a long

23  time.  Preemption would be a government agency by

24  regulations or approvals that preempted the suits and,

25  therefore, you have protection because you complied with

                                                20

1   all the government regulations and have government

2   approval from FDA, et cetera.  I know I am probably

3    simplifying it way down.

4              You are basically arguing if it has FDA

5    or government approval it ought to be dismissed.

6              MS. LATIMER:  That's right.  The only

7    revision I would make to your comments there is that the

8    way the argument would shake out it is not a question of

9    compliance but a question of fact approval.

10             Based upon that assumption and argument

11   that is why we believe it to be a legal issue.

12             Again, I am happy for the cases to

13   proceed right along as we are considering that but it

14   makes a whole lot of sense if we are correct and a

15   bunch of cases are preempted to resolve that right

16   now.

17             THE COURT:  I assume from the plaintiffs'

18   side the plaintiffs are going to say a lot of that

19   depends on what was told and whether information was

20   withheld, et cetera, and discovery is needed on those

21   issues.

22             MR. KELLY:  That's correct.

23             THE COURT:  I wanted to be sure.  That is

24   the other side of the coin.

25             MR. KELLY:  That's correct.

21

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 21 of 87 PageID #: 479

1            THE COURT:  There is certainly nothing
2  wrong with Novartis filing a motion on that ground.  It
3  seems if that is filed and it seems like it will be or
4  has already been or, I guess, is going to be, then to
5  the extent that the defendants need discovery to respond
6  to it, I would set perhaps some guidelines on that.

7            I have no problem with motions like that
8  getting sent up to Judge Campbell when they are ready.
9  I am sure they are going to want discovery because it is
10  going to be an issue about the old disclosure and they
11  are going to argue somehow the FDA or government was
12  misled and studies -- something happened with the studies
13  itself.  I am sure that will happen.

14            Certainly nothing wrong with getting that
15  done.  I wouldn't want to hold things up until we
16  resolved that.  You didn't ask for that.

17            I think what we need to try to do is set
18  some deadlines on that, when you want to file it and
19  how long discovery would take on that issue and to
20  respond.  Obviously 20 days to respond is not correct if
21  you have discovery.  I suspect there will have to be
22  discovery.  I don't think it will go off as a purely
23  legal issue.  That is an area we will look at some
24  deadlines on.

25            Ms. Latimer, he was complaining about

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 22 of 87 PageID #: 480

1    the over-stuffed 440 boxes with no index.  We have to

2    discuss what is going to be done with the massive

3    paperwork, and it seems like we have to have a

4    numbering system to get stuff numbered and identified

5    and what is used, perhaps, in state causes as well so

6    we don't have a whole bunch of numbers on everything,

7    and whether it is on searchable CDs.

8            Those are issues that make sense and we

9    need to resolve and work out.

10            MS. LATIMER:  I agree with that as well,

11    Your Honor.  I think the pendency of the MDL has

12    encouraged us to move to what is certainly going to be

13    an electronic production totally.  Different categories

14    of documents are going to have to get somewhat different

15    electronic treatment because of the nature of the

16    documents.

17            I believe that is something I can

18    negotiate with whomever on the plaintiffs' side I

19    should negotiate with.  That is something I would like

20    to get resolved today.

21            THE COURT:  One of the issues given is

22    the massive amount.  I assume there will be issues about

23    work product and issues about attorney/client, and I

24    know one of the hang-ups that apparently happens is that,

25    obviously, Novartis wants to be careful in handling

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 23 of 87 PageID #: 481

1  documents so that you don't make inadvertent disclosures.
2  I know there have to be cases where you have a safe
3  harbor and you have 30 days to retrieve it without a
4  waiver.  Those are matters we should hopefully resolve.
5             You have a right to be sure you don't do
6  an inadvertent disclosure.  On the other hand that review
7  can slow up the whole process.  Sometimes I think having
8  a safe harbor where you can get it back within a certain
9  time and no waiver may be a way to look at it.  I think
10 we can incorporate that into an order.
11            MS. LATIMER:  I think that would be
12 extremely helpful to our process.  We have large groups
13 of people engaged right now in the review process, in
14 particular for the work product and privilege things,
15 and also this litigation is complicated from a review
16 standpoint for privacy protection that the company has
17 no option whether to produce.
18            THE COURT:  We have HIPPAA problems.
19            MS. LATIMER:  Yes, concerning tons of
20 redactions.  That is not a problem for us substantively
21 but it is a hassle.
22            We are proceeding very much right now
23 moving it on to a fully electronic production, some of
24 which is fully word searchable right now and some will
25 be coded in ways that the plaintiffs will have full

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 24 of 87 PageID #: 482

1   access to it.  I don't think that will end up being a

2   problem.

3                   I think there were disagreements between

4   the parties when we had a few cases.  Now that we are in

5   the MDL world, we have to change that.

6                   THE COURT:  And it has to have a

7   numbering system that you can agree on that can be

8   done.

9                   On the electronic filing, that certainly

10  makes sense.  We will somehow to work it out.

11                  I assume the plaintiffs' side, because of

12  the nature of the case, I assume the plaintiffs will be

13  executing all the blanket releases for their records.

14  We wouldn't have HIPPAA problems as to that.  I know

15  you have studies of individual records that are not

16  the plaintiffs.  I don't know if I can crack that nut

17  today.

18                  MS. LATIMER:  A lot of courts have

19  attempted to crack that nut without a lot of success.

20  It is a difficult process.

21                  We have the litigation or discovery effort

22  that has been underway so we are busily redacting that.

23  I think we will get it done in a reasonable time.  I have

24  a pretty specific protocol on the numbering, bates

25  numbering and water numbering.

25

1          THE COURT:  Water numbering is a new
2    term for me.
3          MS. LATIMER:  Confidentiality markings
4    so if a document is produced the party that receives
5    it, it will be clearly indicated as something subject
6    to the protective order.  I think we wouldn't have any
7    issue -- that is overstated.
8          I don't think the big issue you that has
9    been identified here about the thousands of documents in
10   the boxes will be an issue.
11         THE COURT:  You can get it over to the
12   plaintiffs' side and they will take a look at it.
13         I already mentioned there has been some
14   confidentiality order issues in the state court.  What
15   sort of view -- my thought is we ought to have a
16   confidentiality order and documents produced here can
17   also be used in state litigation and vice versa.
18         We may have different electronic data.
19   You will have to get me the names and telephone numbers
20   of the judges and I may try to give them a call and see
21   where we are.  I think I can communicate with them to
22   see where we are.
23         MS. LATIMER:  In the cases filed
24   originally in this court by Mr. Germany and his
25   colleagues, we have a protective order, umbrella.  I do

Page 26

26

1   want to review that again since we are switching to the
2   electronic system to make sure everything is covered.
3   I don't see any reason why that same one can't be
4   concerning all the federal cases.
5                  With respect to the state cases, I
6   support the state court matters.  My objection is the
7   concern with the protective order covering state court
8   cases is merely that.
9                  THE COURT:  I don't have jurisdiction.
10  I think the state judge can tell me to go fly a kite.
11                 MS. LATIMER:  I am confident that won't
12  happen.
13                 THE COURT:  I am not.
14                 MS. LATIMER:  I suggest the state court
15  plaintiffs have a different set of documents but a
16  protective order in place to protect them.
17                 THE COURT:  Yes.  What I am talking about
18  is if we get a good draft it is essentially the same.
19  The state court has to sign that confidentiality order.
20  We need to try to get one verbiage.  Whatever can be
21  worked out is fine.  I can't tell a state court judge
22  what confidentiality he has like he can't tell me.
23                 MS. LATIMER:  If the order is in place
24  it is good for Novartis.

Page 27

25                    MR. GERMANY:  One request.  We request

                                                          27
 1    on the three cases filed here, we have a sharing
 2    provision.  By that, I mean, right now Mr. Beatie's
 3    group -- I can't sit down and talk to him about those
 4    documents.  I can only do it with my own group.
 5                    THE COURT:  I think it is pretty clear
 6    once we are in MDL -- assume there is sharing among the
 7    plaintiffs --
 8                    MS. LATIMER:  No objection.
 9                    THE COURT:  Some of the issues aren't
10    quite as bad as I thought.
11                    MR. FLYNN:  Pat Flynn.
12                    THE COURT:  Are you going to mess it up?
13                    MR. FLYNN:  I am not going to mess it up.
14    I was wondering about a timetable when Novartis would
15    proffer to us the proposal with reference to the
16    documents.  We are dead in the water until we get the
17    documents.
18                    THE COURT:  Mr. Tummel can hear you pretty
19    well.  You might want to stand there.
20                    MS. LATIMER:  With respect to the
21    revisions in the protective order, is two weeks
22    appropriate?
23                    MR. FLYNN:  That is fine, Your Honor.
                              Page 28

24          THE COURT:  All right.
25          MS. LATIMER:  Similarly the proposed

                                        28
1  protocol for the manner of production, not the production
2  itself but the protocol, I would be happen to have to you
3  within a week.
4          MR. FLYNN:  That is fine.
5          THE COURT:  All right.
6          MS. LATIMER:  I do request that I am
7  only negotiating -- I need to know with whom I am
8  negotiating.  I don't want it with all 12.  They might
9  have different views.  I prefer they work it out among
10  themselves.
11          THE COURT:  We are going to come to that
12  pretty quickly.  I think that is probably not a bad
13  idea.
14          The plaintiffs' agenda, you all listed
15  out three groups.  Is it Mr. Valad?
16          MR. VALAD:  Yes.
17          THE COURT:  You are kind of a group of
18  one?
19          MR. FLYNN:  With my partner John.
20          THE COURT:  The others have multiple law
21  firms.  You are kind of there by yourself.  You

Page 29

22  definitely have a seat at the table.

23          There are proposals for various sundry

24  committees.  It says a proposed list of steering

25  committee's duties and responsibilities will be filed

1   with the Court in the near future and Mr. Flynn was

2   going to be liaison counsel, and talked about

3   subcommittees as to pleadings and briefings and trial

4   preparation committee, document review committee,

5   expert witness, damage subcommittee, class action

6   subcommittee and who was going to be on the committees,

7   et cetera.

8           Let's talk about a that a little bit.

9   One thing as far as costs, my view is the more lawyers

10  at a deposition the longer it takes and the more it

11  costs, and generally it doesn't come out as well.  Too

12  many cooks spoil the broth.

13          I hope when you get in depositions you

14  keep it down to a minimum number of lawyers.  It is

15  intimidating to witnesses if they have a phalanx of

16  lawyers.

17          Mr. Flynn, they suggested you be

18  proposed as liaison counsel.

19          What do you envision as liaison counsel

20  you get to do?

Page 30

21          MR. FLYNN:  Your Honor, I looked and
22  tried to determine my duties.  I am the go-to-person
23  for the plaintiffs as far as the Court is concerned, I
24  think is the primary obligation.  I think in addition
25  to that the steering committee they proposed would

1  select lead counsel which would be a number of three
2  to six lawyers and they would then comprise the counsel
3  who actively were involved in the trial preparation and
4  the trial themselves.
5          I suppose on discovery matters it might
6  be appropriate for the liaison to get instructions
7  from the other attorneys and then negotiate with defense
8  counsel.
9          THE COURT:  Obviously Ms. Latimer would
10  like one person that she can go to initially and work
11  with.  You can't instantaneously speak for all the
12  lawyers?
13          MR. FLYNN:  Quite the contrary, Your
14  Honor.
15          THE COURT:  When we need an answer, you
16  are the one that we pop the questions to?
17          MR. FLYNN:  I will go get an answer.
18          THE COURT:  Or you come back and say you

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 31 of 87 PageID #: 489

19  can't and we will have a hearing to sort it out?

20              MR. FLYNN:  That's correct.

21              THE COURT:  There are a lot of different

22  issues there.  We have this one case we don't know --

23  wrote the number down impromptly, the 394 case.

24              MR. FLYNN:  Ingram.

25              THE COURT:  Yes.  That is the case we

1   don't know anything about.

2               MR. FLYNN:  Can the Court not make that

3   case subject to the --

4               THE COURT:  I also put down why the case

5   shouldn't be dismissed for failure to appear.  There

6   are several things I can do to get their attention.

7               Nobody knows anything about it.  Do you

8   know anything about the contact or anything about it?

9               MS. LATIMER:  I know Mr. Turley is the

10  lawyer.  He is a Texas attorney that filed the case in

11  Oklahoma, and that is all I know about it.

12              THE COURT:  He will probably get an order

13  for failure to show up.

14              MS. LATIMER:  I know he was on the service

15  list also.

16              To make sure the Court is aware, there

17  are additional cases -- and I am sure you are aware --

18    but there are ones docketed in federal court that
19    haven't been transferred over that involve other firms.
20    Just to follow-up on the observation, whatever orders
21    are entered, I would urge the Court they are binding on
22    the subsequently transferred cases as well.
23              THE COURT:  They will be binding unless
24    they can convince me for good cause shown there should
25    be a different result.

1               Anybody have a rough guess how many more
2     cases we have out there?
3               MR. KELLY:  I have a rough guess, Your
4     Honor.  We have filed 93 cases involving 128 plaintiffs
5     in federal court.
6               THE COURT:  That is filed?
7               MR. KELLY:  Yes.
8               MR. VALAD:  I have several to file and
9     talking about whether direct MDL filing.
10              MR. BEATIE:  Russell Beatie.  I am in
11    the long list.  We have approximately 10 or 15 unfiled
12    cases we are collecting medical information on so we
13    can complete the pleadings and file them.  They will
14    get here sooner or later depending whether filed in New
15    York or not or filed down here, with the Court's

16   permission.
17                   THE COURT:  That is 27.  That is 93 gets
18   up to what?
19                   MR. BEATIE:  Our estimate is probably
20   about 150 cases all together.
21                   THE COURT:  Involving a couple hundred
22   plaintiffs?
23                   MR. BEATIE:  Yes.
24                   MR. KELLY:  We have approximately ten
25   more to file.

1                   THE COURT:  All right.  If you wait until
2   everybody gets filed, we will never get done.
3                   I think the order will clearly apply to
4   all cases coming in unless there is some good reason
5   why there needs to be a change.
6                   The steering committee, to the extent
7   you all are filing additional cases, you are in the
8   group.  To the extent that people are not in the group
9   of three plus the one we have right now, we will just
10   have to see where they are.  And that may get into the
11   issue of membership of the committee.  If somebody is
12   going solo, they will want a seat on some of the
13   committees.
14                   If you have four or five solos, I won't
                           Page 34

15  get a committee that gets unwieldy?

16              MR. BEATIE:  Your Honor, our submission

17  contemplated incorporation of the people.

18              THE COURT:  That may be the place to get

19  them on subcommittees.

20              MR. BEATIE:  I can't imagine any

21  circumstance where you enter an order it wouldn't be

22  applicable for the life of this proceeding.  I think

23  orders entered in the future would be subject to the

24  same rational equally applicable to everybody today.

25              If we behave like reasonable people and

1  incorporate these new participants in ways to make them

2  feel like part of the group and people are listening to

3  their ideas, I can't see any problems and --

4              THE COURT:  I think that is good tactic.

5              Let's talk about the issue of direct

6  filing.  I read that and apparently the judge down in

7  Louisiana has done that.  I had a bunch of cases on my

8  docket and they all went down there.  Maybe a

9  consequence of us getting rid of some of those cases we

10  got a MDL case.  Our turn in the barrel, I guess.  I was

11  more happy being on the transfer court than the

12  transferee court.

13               What is the law on that?  Does -- do you

14  have a view on that?  I am a lost ball in high weeds.

15               It speeds things up.  You have to go

16  through MDL and they have to set it and you have 15

17  days to object and if nobody -- and it take time to get

18  down here.  It is probably going to come down here

19  regardless.  It is a question of when.

20               I want to make sure we don't create

21  problems further down the road.  If we have to have

22  certain things go back out --

23               MS. LATIMER:  Our view, it creates too

24  many problems on the back end.  It is inconsistent with

25  the statute itself.  The statute is going to require, as

35

1  the Lexecon County case made clear, require the MDL

2  court at the end of the day, the panel, to remand the

3  cases back to you at the end and then you would have to

4  have a 1404 transfer.

5               We are not saving time on the back end.

6  We are complicating things considerably because the

7  choice of law situation is going to be considerably

8  screwed up.

9               I think the double transfers in place

10  now are certainly throwing things down.  Mr. Beatie's

11  firm is primarily filing cases in New York, which he

Page 36

12  agrees, and told the panel probably would be subject to

13  transfer to trial down the road.  What is going to happen

14  to those cases, they are being transferred here by the

15  panel and have to be transferred back there and then the

16  New York court will consider the 1404 transfers back to

17  Nevada and Oklahoma, et cetera.

18              So, the double transfer cases I

19  definitely --

20              THE COURT:  Run me through that double

21  transfer again.  We have some western states thrown in

22  there.

23              MS. LATIMER:  I do --

24              THE COURT:  Run it by me one more time.

25              MS. LATIMER:  The plaintiffs in the

36

1  currently filed cases --

2              THE COURT:  A bunch in New York, southern

3  and eastern.

4              MS. LATIMER:  Correct.  But on a statewide

5  basis where the plaintiffs are from, 36 cases are

6  implicated.

7              THE COURT:  Thirty six?

8              MS. LATIMER:  Thirty six states.  I meant

9  states.

Page 37

10          Here is what is going to happen in the

11  New York cases as Judge Keeman made clear.  The cases

12  are filed in New York.  The panel, pursuant to the

13  statute, is transferring them here for the pretrial

14  coordinated proceedings.

15          The panel is going to be obligated at

16  the end of this MDL if the cases are not resolved to

17  remand them back to New York.

18          This Court knows and the panel knows,

19  Judge Keenon knows they are not properly venued there.

20  All the other --

21          THE COURT:  I am sorry.

22          MS. LATIMER:  That is what I am calling

23  the double transfer.  It has to go back to New York.

24  Mr. Beatie filed the cases in New York for convenience

25  reasons for him and the panel has very candidly

37

1   acknowledged.  That is fine.

2          Now with the MDL created in Nashville,

3   it makes no sense for the double transfer to be slowing

4   anything down.

5          In terms of direct filing itself, you

6   don't have a double transfer problem but you do have a

7   tremendous wasted effort on a bigger file at the end of

8   this proceeding than the MDL.

Page 38

9          The panel is going to be obligated when
10    you remand these cases out, the panel is going to be
11    obligated to remand them right back to you even though
12    they are not properly venued here because of convenience
13    reasons.
14          The plaintiffs and their treating
15    physicians are from somewhere else.  The remand back
16    will be here.  The court staff is going to have to
17    figure out and divide up these very large files and move
18    the files twice, and back to these home jurisdictions.
19    People are trying to deal with these problems.  The
20    statute contemplates on the transfer in and transfer
21    out.
22                THE COURT:  Well, I am not going to
23    resolve that one.
24                MR. BEATIE:  May I speak to that?
25                THE COURT:  Mr. Beatie?

1                MR. BEATIE:  Yes.
2                THE COURT:  I am terrible on names.  If I
3    screw up your name it is not personal.
4                MR. BEATIE:  It won't be the first time.
5                THE COURT:  I get senior moments and
6    forget my own name.

Page 39

7          MR. BEATIE:  We have had this issue
8   before.  We have given considerable thought in our
9   office and paid a great deal of attention to it before
10  we began processing the filings in all the cases in New
11  York, to give some sense of convenience to clerks'
12  offices everywhere.
13          Our view is the case ends up here one
14  way or the other.  The most convenient way for them to
15  end up here is permit us to do direct filing as we saw
16  Judge Fallon do in the Vioxx case.
17          We understand the business about
18  remanding back to the panel and back to you and off
19  somewhere, not to outer space but a someplace that has
20  some logical relationship to the facts.
21          It doesn't seem to me to be any reason
22  why at the conclusion of the proceedings, multi-district
23  proceedings when you and the district judge are finished
24  with us and ready to send us to the jurisdictions where
25  the cases should be tried, I don't see any reason why

39

1   we can't agree now or later that they would be sent to
2   a jurisdiction that would be appropriate.
3          For example, the residence of the
4   plaintiff, state of residence of the plaintiffs.
5   There may be one or two cases that will require motion

Page 40

6   practice because of peculiar circumstances.

7            What I suggest is to allow the court for

8   direct filing, that we will behave like intelligent

9   people and we will at the end agree on the remand to

10  the state that would be an appropriate jurisdiction for

11  the case.

12           THE COURT:  Now, when I originally saw

13  that I was naively thinking at the end this Court would

14  do a remand back to the, quote, appropriate district.

15  Both of you seem in agreement.

16           MR. BEATIE:  I think that is the correct

17  way.

18           THE COURT:  I think you said it would to

19  go back to the MDL.

20           MR. BEATIE:  I don't understand that to

21  be the case.  The practical effect here, if we remain

22  here and try a battery of test cases here as you

23  suggested earlier, at least I understand that.  I am

24  unfamiliar with any multi-district proceeding that ever

25  went back anywhere.  They always end in the

                                                    40

1   multi-district court.

2            One would hope we would all come to our

3   senses and be able to work something out like that

                      Page 41

 4    here.

 5              So my guess is, as a practical matter,

 6    we never reach the question at all.  But also as a

 7    practical matter, I advise the Court we would behave

 8    like rational people and not fight over remand

 9    jurisdictions because we think jurors are better in

10    Minnesota than in Wisconsin or whatever.

11              THE COURT:  Nobody wants to go to Baxter,

12    Texas or the one up in Illinois.

13              MR. BEATIE:  Given the fact my wife is

14    from Texas and I lived there when I was a little boy, I

15    would like not to go to Texas in the summertime if that

16    could be avoided.

17              THE COURT:  Okay.  Maybe it is Minnesota

18    in the winter.  Maybe the best thing to do is let you

19    all submit a short brief on that.  That is obviously

20    something that is going to impact this.  That is

21    something I want to discuss with Judge Campbell.  I won't

22    rule on that this morning.

23              I would be interested to see if somebody

24    files within the next 10 days a brief and copy of judge

25    Fallon's order.  I will take a look at that and kind of

                                                        41

 1    see.

 2              A practical standpoint, I admit.  It
                          Page 42

3   does -- initially I like the idea to get things going

4   on the front end.  I agree historically it is rare a

5   MDL case goes back.  Again, there is always that

6   possibility.

7              I think we have to prepare for the

8   worst.  If it did happen, I understand, Ms. Latimer,

9   your position is that would be a huge mess at the

10  end.

11             It may be if they came in -- they come

12  in with an agreement they go back to where they go so

13  we can avoid that problem.

14             I kind of like the concept but I want

15  to make sure I am not picking up a few too many thorns

16  with my rose.

17             MS. LATIMER:  We will brief the issue.  I

18  think it was addressed by the Supreme Court, frankly.

19             THE COURT:  That is always good guidance.

20             MS. LATIMER:  Sometimes.  It is guidance.

21  I am not sure it is good guidance always.

22             THE COURT:  Ten days or so is fine.

23             Let's go back to our committees a little

24  bit.

25             I think who is going to be on the

42

Page 43

1  committees, first cut at it, is the plaintiffs.  You
2  all are much more familiar with the players and what
3  you want to do than I am.
4              You said you were going to file some
5  lists and duties and responsibilities with me.  I guess
6  that is the best way to get that done.  That is where
7  we need to start putting names to it, with the
8  provision that we get other counsel coming in that feel
9  like they want a seat at the table, we will have to see
10 about adding.
11             I think clearly there has to be a size
12 limit to a committee.  You get 20 people on it and
13 you defeat the purpose.  I think three, five, six,
14 seven.  You get much more than seven and I get a little
15 nervous.
16             What is your thought to the size and
17 which committees we need?
18             Mr. Flynn or Mr. Germany?
19             MR. GERMANY:  Judge, I think we did a
20 pretty good job describing what we needed in the agenda.
21 We have had two meetings of my group -- I don't know
22 how it became my group -- Mr. Beatie's group and Mr.
23 Valad's group.  I think we have a pretty good idea how
24 we would like to do it.
25             The proposal would be two members from

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 44 of 87 PageID #: 502

1  my group and two from Mr. Beatie's group and two from
2  Mr. Valad's group to make up the steering committee
3  and the steering committee would make the subcommittee
4  assignments, all this subject to the Court's approval,
5  of course.
6              THE COURT:  You would have six on the
7  steering committee?
8              MR. GERMANY:  Yes, sir.
9              THE COURT:  Again, I know we don't
10  necessarily know.  Do you envision out there somewhere
11  there is going to be another firm that is going to come
12  in with several cases?  You may not have a way of
13  knowing.
14             MR. GERMANY:  I have had conversations
15  with one other group.  They only have two cases at the
16  present time in state court, and one case in federal
17  court.  They expressed some interest in serving on the
18  subcommittee.
19             Certainly once their cases get to this
20  Court and we know them, we will be happy to talk to
21  them.
22             THE COURT:  What about your New Jersey
23  cases?  You have the group of three here.  You have
24  got -- plus one.  You all got some contact with those
25  cases.

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 45 of 87 PageID #: 503

1                     I am thinking, to think informally, is
2     there some form of contact with that?
3                     That is split up with different state
4     judges?
5                     MR. VALAD:  I believe Mr. Valad has most,
6     if not all, of those.
7                     MR. VALAD:  I have the seven in New
8     Jersey and I am working with the other plaintiffs'
9     attorneys, the three groups described.
10                    THE COURT:  You would be on this steering
11    committee?
12                    MR. VALAD:  Yes, Your Honor.
13                    THE COURT:  That might be one way to keep
14    us posted on what is going on in New Jersey.
15                    From Novartis' standpoint, do you have
16    any comment on the committees?
17                    Do you have a dog in that fight?
18                    MS. LATIMER:  No dog in that hunt, Your
19    Honor.
20                    THE COURT:  Well, that makes sense to
21    me.  I guess you all agree if I need to jump on somebody
22    and haul them up and shoot them that Mr. Flynn is the
23    designated target.
24                    Congratulations, Mr. Flynn.
25                    MR. FLYNN:  Thank you, Your Honor.  It is

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 46 of 87 PageID #: 504

45

1   a real honor.

2              THE COURT:  You may be like the javelin

3   team that elected to receive.  We will see how that

4   goes.

5              MR. FLYNN:  As a practical matter, we

6   probably need to propose that we will actually put in

7   writing a list of the committees, the identity of the

8   steering committee members.

9              May I confer with counsel?

10             THE COURT:  Sure.

11             MR. FLYNN:  Identify subcommittee

12  members, too.

13             Do you want those submitted to you for

14  your approval or simply for your advice?

15             THE COURT:  What is the difference

16  between advice and approval?

17             MR. FLYNN:  We could go right ahead or

18  see if you are okay with it.  That is the difference.

19             THE COURT:  I guess my thought is if you

20  advise me -- unless somebody files an objection.  You

21  might have somebody that feels like they were hurt or

22  something.  My thought would be I would approval it.

23             I think I could do an approval subject to

24  any objection filed within 25 minutes or something.

25  Seriously, more like seven days or something.

Page 47

1              MR. FLYNN:  That casts it in a different

2  light.  You give us an order and this would be

3  interlocutory in nature.  If somebody got unhappy they

4  could file a motion to alter or amend your order.  I

5  would prefer that.

6              THE COURT:  That may be one way to do

7  it.  I usually do my own orders.  I think I may have

8  you do the drawing of orders.

9              Mr. Tummel is keeping good notes.  I

10 assume you will want a transcript from him.  I think we

11 will need one.

12             My notes are sketchy.  After about two

13 or three days, I can't read most of them anyway.

14             Mr. Flynn, I would suggest you draw up a

15 proposed order on that, and I think that is a good idea,

16 an order directing you to do all those things and

17 provide in it that any party having objection to it

18 needs to file something and we can see if there is a

19 necessity to modify it.

20             Now, as far as the committees, you all

21 know more about what you need as far as committees and

22 subcommittees.

23             From Novartis' standpoint, I think if

24 they have a steering committee they can deal with it

25 and it makes their life easier.

47

1          I assume to the extent there gets to be
2   a squabble that the committees or subcommittees are
3   going to run it up to the steering committee.
4          I am also interested in how it is going
5   to get to me.
6          MR. GERMANY:  Judge, what I envision,
7   based upon past experience, is that the problem would be
8   reported to the steering committee and they would meet
9   and confer and decide how to address that problem and
10  that information would be passed to Mr. Flynn and then
11  the appropriate person for Novartis.
12          If it involves the Court, of course, we
13  will notify the Court.
14          THE COURT:  I know local counsel are
15  familiar with this.  I am a great believer that lawyers
16  ought to talk to each other.  I get real frustrated
17  when I get motions in and they say I called and left an
18  e-mail or voice mail and it turns out they never spoke
19  to each other.
20          I realize we have New York, Washington,
21  California, Nashville lawyers.  I would like you all to
22  talk to each other.
23          Normally in my orders I also put in a
24  requirement before anybody files a discovery dispute,

Page 49

25    you actually talk to me about it.  Obviously we have a

48

1    steering committee or liaison, and that is a manageable
2    group I can handle.  I really like to talk to people
3    about discovery problems.
4                I found -- this is the first MDL case I
5    have handled, and that may be different.  Generally,
6    I have found if they tell me the dispute that about 95
7    percent of the time we can solve it.
8                I will say this is my view on that, and
9    people move on and we don't get -- it gets done a lot
10   quicker without paperwork.
11               You have motions and responses and I
12   have to take a look at it.  If I can do it by phone, I
13   can do it.  I am generally available.
14               I am taking recall status the 3rd of
15   August.  I will be gone from the 3rd to the 12th and
16   you won't catch me.  I am out of the country in Fiji.
17   I hope to -- I hope to dickens they don't have e-mails.
18   I plan to be diving with my wife and a group, and I don't
19   plan to think of anything.
20               Coming back, I will be moving down the
21   hall where Judge Nixon used to be.  I am back on recall
22   status.  My load is going down a little bit but -- at
23   least until I got this.  I am good for a year and a day

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 50 of 87 PageID #: 508

AREDIA

24  subject to an additional year and day.

25              I do like to talk to the lawyers to

1   hopefully resolve it without getting into a lot of

2   paperwork.

3              MR. FLYNN:  Your Honor, I am not familiar

4   with your practice with reference to being able to call

5   the judge and talk about things.  I like the idea.

6              Did you notice in our paragraph 11 of

7   our proposed agenda we have a meeting/confer requirement

8   we would like put in the order?

9              THE COURT:  That is in our local rules.

10  I take it another step.  Before you file that motion,

11  you have to talk to me about it.

12             MR. FLYNN:  You want us to have a

13  conference with you?

14             THE COURT:  Yes.  I think 95 percent I

15  can resolve.  This may be more complex than that and

16  some issues you really have to look at the motion and

17  get their side.  Particularly when you get into

18  privilege and other issues that might have to be

19  briefed.

20             I can't do everything by a telephone

21  call.  It tends to keep the case moving.

Page 51

22                    MR. FLYNN:  You might notice our

23    meeting/confer requirements go beyond discovery, which

24    I think the local rules just deal with discovery.

25                    We  are asking for a meeting in person

1    or telephone conference in connection with all motions.

2                    THE COURT:  I don't think that is a bad

3    idea.

4                    Ms. Latimer, what is your thought on

5    that?

6                    MS. LATIMER:  Can I safely assume they

7    don't agree to my preemption motion, based upon this

8    morning's conference?

9                    MR. FLYNN:  We haven't conferred on that,

10    Your Honor.

11                    MS. LATIMER:  I have no objection to

12    meeting and conferring.  I notice it says if we haven't

13    heard back in two days --

14                    THE COURT:  That may be a little quick.

15                    MS. LATIMER:  I would prefer to stick

16    with the good faith requirements that the Rule requires.

17    In a given circumstance two days might be great but

18    different circumstances it might not be enough.

19                    I was uncomfortable with that provision.

20                    THE COURT:  What I don't want -- and I

Page 52

21  get this all the time -- a motion will come in and they
22  say I left an e-mail or voice mail and I haven't heard
23  from them in two days.  I don't want any of that.
24              I want some actual communication.  I
25  assume you have, perhaps, other litigation, and counsel

                                                        51

1   might.  Sometimes you can't get back in two days.
2               I don't think we need to put two days
3   in there.  Maybe five days is a more reasonable amount
4   of time.
5               I want active communication.  I don't
6   want I left a voice mail and nobody responded.  That
7   won't work.
8               MR. FLYNN:  Thank you.  We will change it
9   to five days, Your Honor.
10              THE COURT:  If we get into discovery
11  disputes, let me give you a couple sort of philosophical
12  views I have.
13              I see an awful lot of discovery stuff
14  that comes before me in regular cases.  You see these
15  incredibly broad questions that ask for every document
16  from the beginning of time.  I had the one that had from
17  the beginning of time.
18              The other side will come back and say it

                        Page 53

19    is vague, burdensome, incomprehensible, et cetera, et

20    cetera.  In other words there are no such documents or

21    nevertheless documents are provided.

22              My view is if you have a good objection,

23    make it.  Don't just throw it in because it is in your

24    word processor, stock objections.

25              I realize counsel are concerned about

                                                            52

1     waivers.  If you want to get me in a bad humor with

2     page after page of stock objections and then an answer

3     at the end, that just puts me in bad humor for whoever

4     does it.

5              If I see a question that is terribly

6     broad, that doesn't put me in good humor.  If you ask a

7     garbage question, don't complain to me if you get a

8     garbage answer.  If you ask a good question you will get

9     a good answer.

10             Let me lay that out as my general

11    philosophy.  A good question deserves a good answer,

12    and don't exercise your word processor answer.  Put

13    some thought into the question and answer.

14             I had one case I swore I would make the

15    attorneys hand write their questions and answers just to

16    get it out of the word processor.

17             I am not a big fan of ten pages of

18  definitions where and is defined as and and is is

19  defined as is, et cetera.  That turns me off.

20          If you want to get me into bad humor

21  that says denied or granted, depending whose side is

22  irrelevant, that is how I get my denied and granted

23  stamp out.

24          I do a lot of denied and granted on

25  orders because it is quick.  I am fairly prompt on

                                            53

1  ruling of things.  Right or wrong, I will rule.  If

2  somebody wants to take me up to Judge Campbell, he

3  gets paid the big bucks to do that.

4          Generally, he is of the view I have to

5  be clearly erroneous or contrary to law.  If he starts

6  reversing me a lot -- unless I am flat off base, it

7  won't be remarkably successful.  I may be wrong.  I am

8  sure I made them before and I will make them in the

9  future.

10          You don't offend me by taking it up to

11  Judge Campbell.  That is what the rule says and you

12  ought to do it.

13          How long do you think you will be to get

14  me some sort of view who the committee and all is going

15  to be?  I think you can do that fairly promptly.

                         Page 55

16              MR. FLYNN:  Because of the holiday, 10

17  days, Your Honor?

18              THE COURT:  Yes.  You have the Fourth of

19  July.  I think the best thing to do is put it in the

20  form of -- put a draft order with it.

21              MR. FLYNN:  Yes.

22              THE COURT:  Now, let me see.  Do you want

23  a brief break?  I think I do, on second thought.  Let's

24  take five minutes and you all be back in ten.  Nobody

25  takes a five minute break.

54

1              (Whereupon, the Court was in recess.)

2              THE COURT:  Let me look down at my notes

3  to see what I had.  We covered a lot.

4              I think we have to get to some dates on

5  disclosures and various other things, and try to get

6  some dates set.

7              MR. FLYNN:  Your Honor, may I comment on

8  that a moment?

9              THE COURT:  Please.

10             MR. FLYNN:  We are particularly excited

11  as plaintiffs that we actually have three trial dates

12  carved out at this time.

13             THE COURT:  I am not sure Judge Campbell

14  held those dates when it went MDL.  He wants some trial

Page 56

15  dates, and we can take a look at them to see if it is

16  possible.

17          MR. FLYNN:  Here is what I would suggest,

18  and perhaps other people have something else.

19          We believe it will make sense, since the

20  cases are pretty clear all separate cases and the local

21  cases here are going to be prepared for trial, that the

22  plaintiffs in the local cases -- or let's just say the

23  plaintiffs be allowed to identify three cases or four

24  cases that they want to try first.

25          The plaintiffs also like the idea of

1  test cases, and open discovery be permitted on those

2  cases by the defendants in the sense that the defendant

3  can do whatever discovery they want to do on those cases

4  and at the same time we are all proceeding with the MDL

5  discovery that is general in nature but a stay issue with

6  reference to the other plaintiff's cases until MDL is

7  completed.

8          In that way we don't bog down individual

9  plaintiffs' depositions.

10          I think I saw the defendants wanted some

11  number, 18 was it -- perhaps I am mistaken.  But could

12  we have a stay except for four plaintiff cases?

                        Page 57

13                    THE COURT:  Well --

14                    MR. FLYNN:  And we also have trial dates

15    for those cases.

16                    THE COURT:  Judge Campbell had made it

17    clear he wanted trial dates for the three cases.  Absent

18    the plaintiffs or parties, the only cases that really

19    have absolute jurisdiction here that can be tried in

20    this district are the three original cases.

21                    Are there any others that would be

22    subject to trial here absent consent?  Absent consent,

23    you can only try those that are here to start with.

24                    MS. LATIMER:  Yes, Your Honor.

25                    MR. BEATIE:  Your Honor, I am not sure

                                                         56

1    that is necessarily so.  I think Judge Fallon did

2    whatever he wanted to do with trying cases, with

3    establishing a track record to assist him in settling

4    the entire proceedings sent to him.

5                    THE COURT:  That is one thing I wanted to

6    discuss a little bit.  Some of the other parties might

7    feel like if the three Nashville cases get tried here

8    perhaps one of their cases would be a best test case or

9    Novartis would think it might be another case.

10                    Clearly, we are going to request a target

11    trial date.  It might be the same that Judge Campbell

                              Page 58

12    set.  We will set a trial target date on those cases in
13    Nashville.  What we do as to the other cases, that is
14    certainly open for discussion.
15                 Ms. Latimer, from Novartis' standpoint
16    do you have any view where that should ultimately go if
17    we try to select some test cases?
18                 I am sure you're not wild about the
19    plaintiffs getting the sole pick of which cases get
20    tried first.
21                 MS. LATIMER:  That is true.  I think the
22    Vioxx example is not good.  Judge Fallon is looking at
23    potentially a hundred cases.  And I understand we are
24    looking at 150 here.  Putting that aside for the moment,
25    here are a couple things.

1                 The observation today, for the first time
2     we are no longer pursuing the class action on the
3     personal injury side changes, frankly, everything with
4     respect to scheduling and the way we were intending to
5     work up the cases and specifically as it relates to the
6     trials.
7                 There are 35, I believe, punitive
8     class members, named plaintiffs in the three Tennessee
9     cases.

10            THE COURT:  Yes.  They picked a wide

11    variety.  I see they have something from foreign

12    countries.  We may need to --

13            MS. LATIMER:  I believe all the foreign

14    nationals have been dismissed or dropped out.

15            MR. GERMANY:  That's correct.

16            THE COURT:  I didn't pick up that they

17    dropped.

18            MS. LATIMER:  When the case is cued up

19    as a potential class action the issue was whether it

20    would be certified as a class.  The question of venue

21    and the proper place for trial were real different than

22    if you are talking about individuals.

23            Of the 35 only two are residents of

24    Tennessee.

25            Novartis would very much intend to

58

1    pursue a 1404 transfer of appropriate cases for trial

2    down the road.  We have not made any investigation or

3    inquiry about that because at this point we were just

4    considering whether the cases -- there is no reason to

5    transfer a case out at the moment that supposedly would

6    be a national class action.

7            So this changes a lot in terms of where

8    the cases are headed for potential trial dates, in our

Page 60

 9  view.  I don't know what district -- I am sorry.  I
10  should know.  I don't know where the two Tennessee
11  plaintiffs reside, what district.
12              THE COURT:  I think they are the Middle
13  District, aren't they?
14              MR. FLYNN:  I think they are the Eastern
15  District.  They are the Eastern District and we have
16  three more to file that are Tennessee residents.
17              THE COURT:  Somebody has a Middle
18  District case because they were filed here.
19              MR. FLYNN:  We have the Western
20  District.  I don't have the ability to tell you
21  offhand.
22              MS. LATIMER:  As a national class it is
23  fine to consider all the venues.
24              THE COURT:  I guess it is too late now.
25              How did we end up in the Middle District.

                                                    59
 1              MS. LATIMER:  Because the national class
 2  could be decided anywhere and MDL could be.  I am not
 3  wanting to give up cases where my witnesses are, Your
 4  Honor.
 5              I need to go back and look where the
 6  plaintiffs are.  I am not prepared to do that today.

                    Page 61

7          THE COURT:  I could pull the first three
8    cases.  I was thinking some were from the Middle
9    District, some of the plaintiffs were.
10          MS. LATIMER:  I don't believe so, Your
11   Honor.
12          MR. FLYNN:  Your Honor, they are from
13   the Eastern District, I believe, and Western District.
14          I think it is pretty clear under the
15   law that the jurisdiction is within any district within
16   the state.  They are properly filed, without question,
17   here.
18          THE COURT:  At least in your view.
19          MS. LATIMER:  I am not arguing pure
20   venue.  We have argued it all over the country.  That
21   would not necessitate a trial where we do business if
22   the key witnesses and evidence are in a different
23   district or forum.
24          THE COURT:  I will leave that aside.  I
25   am going ahead for the three cases that are filed in

                                                    60
1    Tennessee.  I need to get some dates.
2          That is not foreclosing you from having
3    valid objections if they should be done somewhere
4    else.
5          I have to start somewhere.  I guess this
                          Page 62

6  is one I will stick the plaintiffs with drawing up the

7  initial case management order.

8           Obviously, before you get it to me for

9  approval, I want it submitted to Ms. Latimer as well.

10          I want to go ahead and lift the stay on

11 discovery for all purposes in the three Tennessee cases.

12 The other cases, it seems to me, however we describe it,

13 we need to lift the stay as far as MDL work would be

14 done.

15          The question in those cases is how much

16 do we want to get -- from Novartis' standpoint -- how

17 much we want to get in to the details of the plaintiffs'

18 specific medical situations.  I think that, obviously,

19 would be a much broader issue.

20          I could also see from Novartis'

21 standpoint if there are going to be trials there may

22 be some cases that are more representative of it than

23 these three.

24          I don't want to foreclose you from

25 having an ability to suggest some other cases for

61

1  trial.

2           What we might do on that, Ms. Latimer,

3  is to go ahead and get this started and if you feel

Page 63

 4    there is a small number of additional cases we ought

 5    to open up for more specific discovery, you can ask for

 6    us to do that and we can look at it.

 7            I am trying to keep the trial dates in

 8    the three Tennessee cases -- I am not foreclosing by

 9    any stretch -- those have to be the first three tried.

10    You have to look at it.

11            MS. LATIMER:  I might not be clear on what

12    the Court is proposing.

13            THE COURT:  I may not be clear.

14            MS. LATIMER:  The three Tennessee cases

15    as it's established now involves some 35 plaintiffs.

16            THE COURT:  They dropped some out.

17            MS. LATIMER:  I think it is about 35.

18            THE COURT:  Let me ask Mr. Flynn.

19            Would you agree if you're going on those

20    cases Novartis would have the right and obligation, in

21    fact, as representing their client to go into specifics

22    with those 35 people?

23            MR. FLYNN:  Yes.  That is why we wanted

24    to pick them.

25            THE COURT:  All right.

62

 1            MS. LATIMER:  I am just having --

 2            MR. GERMANY:  He is trying to figure

                      Page 64

3   out how many we are talking about.

4                   MR. FLYNN:  Four.

5                   MS. LATIMER:  I don't know who is

6   representative if I am only given four.  If I have 35,

7   maybe I can figure out who the representative will be.

8                   MR. FLYNN:  Apparently she is saying

9   the reason the Court can't stay discovery is that she

10  wants to be able to pick her cases.  Perhaps her

11  discovery could be limited -- I don't know how to do

12  that.

13                  What she needs to have is a questionnaire

14  she prepares that we answer and based upon that

15  questionnaire then she can do a motion or deal with this

16  further.

17                  MS. LATIMER:  We propose in our agenda a

18  plaintiffs' fact sheet to kind of substitute for

19  interrogatories.

20                  THE COURT:  The fact sheets seem to make

21  sense to me.

22                  MS. LATIMER:  That is commonly done.  If

23  you are talking about test cases, I kind of need to

24  think that through because the landscape has changed a

25  lot.

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 65 of 87 PageID #: 523

1            THE COURT:  I am not setting you in

2    concrete.

3            MS. LATIMER:  That is fine.  It is good

4    to talk through it.

5            I believe you can't pick a representative

6    case without knowing what the population is we are

7    talking about.  I won't know that until I get this

8    questionnaire back, or fact sheet back and you can get a

9    fact sheet to liaison counsel to work out with the

10   steering committee in a couple weeks.

11           I have no problem with that approach at

12   all.  I would like that kind of information from the

13   plaintiffs as a group, if we are going to talk about

14   what is representative and what is not.  This is a very

15   diverse population.

16           MR. FLYNN:  We agree she is entitled to

17   that.

18           I got off track intellectually.  I do it

19   more and more, I think.  The Tennessee cases will be

20   set.

21           As far as test cases, that is another

22   discussion that Ms. Latimer discussed with us.  We

23   agree that the questionnaire ought to be obtained and

24   returned to her promptly.

25           THE COURT:  It sounds like we need to

Page 66

1  provide for a questionnaire.  Let me be sure I am

2  understanding.

3              When we say the three Tennessee cases,

4  those are three cases.  But if you look at the number of

5  named plaintiffs in those cases, Ms. Latimer is saying it

6  is 35 named plaintiffs.

7              MR. FLYNN:  Right.  I am talking about

8  the Tennessee cases that are named.

9              THE COURT:  That is a smaller group.

10  From Ms. Latimer's standpoint that may or may not be

11  the ones they prefer to try first.  She doesn't know,

12  and you agree she is entitled to a questionnaire, to

13  come up with it?

14              MR. FLYNN:  Yes.

15              THE COURT:  I want to get some cases set

16  for trial.  Once we get some trial dates set and work

17  toward those dates there can be modifications and

18  changes.  You have to start somewhere.  There is nothing

19  like a trial date to focus peoples' attention on trying

20  to settle it or whatever.  Obviously, this is a case,

21  to settle it, is going to involve substantial,

22  significant funds perhaps, or whatever.  If there is

23  anything I can help on that, I will do it.  That is

24  probably down the road.

25              Let's go down the rest of the notes.  I

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 67 of 87 PageID #: 525

1    had notes about foreign depositions and procedures.

2    That is out.  That could have complicated things.

3                   We talked about filing the cases here.

4    You will brief that.

5                   We talked about the steering committee.

6    I don't know that -- I think the plaintiffs mentioned

7    something about sort of handling -- I don't know -- fees

8    or anything.  I don't need to get into that as such.

9                   Obviously, if it ever comes down to fees,

10   I think one or two or three attorneys is probably

11   plenty.  I wouldn't approve of having a whole flock or

12   covey of plaintiffs' attorneys at each deposition.  To

13   the extent I get into fees, that wouldn't fly with me.

14                  MR. GERMANY:  I don't think that will be

15   a big problem.  I think within the committee we can

16   establish who should be there and who will not.

17                  The main reason what I asked the Court

18   for, the standard procedure is that any lawyer from

19   around the country, as I understand the law, who does

20   work on a Novartis case seems to think it may have

21   produced a favorable outcome would at some point have

22   the right to come to this Court and file a motion to

23   get some of the common benefits, funds we will ask you

24   to create at some point.

25                  All we want is a set rule that everybody

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 68 of 87 PageID #: 526

1  plays by; there won't be different type motions filed

2  at the end of the day.

3                 THE COURT:  You have something in mind?

4                 MR. GERMANY:  Judge Fallon -- I hate to

5  keep going back to him.  You get a headache trying to

6  reinvent the well.  He has a very detailed --

7                 THE COURT:  I know Ms. Latimer agrees

8  with some of the things he did.  I don't know if you

9  are familiar with it.  You're not in that case.

10                 MS. LATIMER:  No dog on that one.  I

11  don't care how the plaintiffs' lawyers get paid.

12                 THE COURT:  Well, I will be glad to take

13  a look at that.  I think you are right.  My view is that

14  the people that do the labor ought to get the benefit.

15  Somebody at the end that comes in saying me too shouldn't

16  get an undue share.  That is common sense.  The people

17  that do the work, to the extent there is a reward, at

18  the end of the day get it.

19                 Let's take a look at the rest of these

20  notes.  What sort of dates can we pick?

21                 We have got some mandatory disclosures.

22                 What sort of dates do we want to look at?

23  I need to work out some dates.

24                 Also in this initial case management

25  order, I would like to get from the plaintiffs' side

1  just a Readers Digest version of your theory of liability

2  and, obviously, each plaintiff is different. I would

3  like to get that in two or three pages.

4             When people do the theory of cases, they

5  hit the printer and out it comes. I would like to get

6  the general theory of your defense, and it is very

7  clearly understood this is a working paper. You're not

8  bound by it. It is going to change as discovery takes

9  place. Just so I get one short -- an idea where you

10  have a short version of their theory of liability and

11  your theory of defenses. You're not set in stone like a

12  pretrial order. It is just for my benefit, to see if I

13  missed anything. I would like to get that incorporated.

14  I like that up front.

15             How about the mandatory disclosures?

16  What kind of time frame do we need on those? Obviously

17  that can be -- more mandatory disclosures involving the,

18  quote, three Tennessee cases and other mandatory

19  disclosures on the MDL broader issue.

20             I don't have a problem setting different

21  dates for different type disclosures.

22             That is something you need to talk about

23  maybe. Maybe we shouldn't try to do that all this

24  morning. I want it incorporated into the order.

25             MR. FLYNN: Has Your Honor had an

1  opportunity to review the case management orders in place

2  in these three cases?

3              THE COURT:  I had the opportunity but

4  didn't do it.

5              MR. FLYNN:  We actually have a timetable

6  leading to the trial date in November, 2007 set forth

7  in these three case management orders.  Granted, they

8  have -- they have to be revised.

9              THE COURT:  I didn't read them.  I

10  probably should have.

11              MR. FLYNN:  Would you like us to confer

12  and propose an order?

13              THE COURT:  I think that is probably

14  best.  Maybe go ahead and give us some general views.

15  You obviously think November, '07, some time in that

16  time frame is reasonable to try one or more of these

17  cases.  I guess you all agreed to that back when those

18  were the cases here.

19              Now that we know a little more about it

20  and perhaps it might have been simplified a little bit

21  since we won't have the full class action on it -- maybe

22  you all need to take a look.  That would be a good

23  starting point.

24              If you could do something in the next 10

Page 71

25    days or so on that and then get me a draft order that

69

1    incorporates what we use in this district, and using that
2    as a sample would be a good start.
3                    MS. LATIMER:  We will confer, Your
4    Honor.
5                    So the Court is aware, we may well be
6    submitting competing trial dates for your consideration.
7                    THE COURT:  That doesn't bother me.  If
8    that happens the easiest thing to do when you get to that
9    paragraph, plaintiffs have their suggestion and you have
10   yours, and that is why you can send it to me in an
11   electronic form and I can cut and paste and I will pick
12   something.
13                   Judge Campbell will set the actual trial
14   date.  He may well want to try to hold on to the
15   original dates.  I don't think we can say those dates
16   are the ones set right now.  When it went MDL, those
17   scheduling orders, if not direct, by implication they
18   have been superseded.
19                   MS. LATIMER:  I guess I was going to
20   make that observation as well.  From our standpoint,
21   from the point MDL was filed a number of people -- we
22   have been in kind of a six month holding pattern.
23                   I am not comfortable that the previous
                                Page 72

AREDIA

24    trial date was the --
25                    THE COURT:  We have lost a certain amount

1     of time because of the MDL.  I want to get as early a
2     trial date as practical and the word practical is just
3     that.  We have got to have a trial date at some point.
4     I prefer it sooner than later.
5                    This is not the rocket docket out of
6     Alexandria.
7                    MS. LATIMER:  Thank you.
8                    THE COURT:  I have some friends on that
9     court and they are very proud of it.
10                   MS. LATIMER:  It is an exciting place to
11    be.
12                   THE COURT:  We had a judge in east
13    Tennessee that long since is deceased, but he was
14    famous for setting the trial date before the answer
15    was filed.  You east Tennessee lawyers are perhaps
16    familiar with Judge Taylor.  He set the trial date before
17    the answer was filed.
18                   You would call a witness and he would
19    ask the witness three questions on the stand and then
20    dismiss the witness.
21                   You have tried cases up there, haven't
                         Page 73

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 73 of 87 PageID #: 531

22  you?

23           MR. FLYNN:  I have.  He would tell you to

24  pick your two best witnesses.

25           THE COURT:  Obviously, we will have, I am

71

1  sure, all sorts of experts in this case.  And those are

2  issues that you need to address in the scheduling order

3  as much as you can.

4           One of the issues you will need to take a

5  look at, traditionally you kind of close discovery out

6  and disclose experts.  Whether or not some experts need

7  to be disclosed before we close discovery or set

8  discovery and then experts after that, I am flexible on

9  that.

10           You know more about the likely scenario

11  that will follow in this case.

12           To the extent we get into affirmative

13  defenses, I am a believing who has the burden of proof

14  goes first on the experts as far as disclosure.  I am

15  sure you all have some experts lined up and under

16  contract, or whatever.

17           We need to get that expert provision

18  in.  Some of our judges say you can't file a parallel

19  motion for summary judgment.  Judge Campbell doesn't

20  have that rule.

Page 74

21          Motions can be filed at any time.

22          If you start getting just a tremendous

23 amount of piecemeal motions, he will put a stop to it or

24 tell me to.  Sometimes there are motions like you

25 mentioned, one that needs to be filed early perhaps.

72

1          When we put a deadline in for motions

2 that doesn't preclude it from being filed earlier.

3          I normally allow 28 days and replies are

4 14 days.

5          Our local rules are 25 pages.  Again,

6 that is not set in stone.  If the parties need more, we

7 can certainly expand that.

8          I normally keep replies to five pages.

9 It takes a awful lot to convince me to have it more.

10 You have to quit writing sometimes and let the judge

11 decide it.

12          Again, if there is a necessity for pages,

13 I think we can put page limits in subject to the approval

14 of the Court.

15          Some cases need more time.  These cases

16 are complex.  I can see that 25 pages might be

17 inadequate.  I like to keep things as short as I can.

18 Mark Twain apologized to a friend for writing I am

Page 75

19    story and said I didn't have time to write a shorter

20    letter.

21              Let's keep it reasonable.

22              Mr. Flynn, I looked at them before but

23    it has been some time back.  I should have looked at it

24    last night.

25              MR. FLYNN:  I don't think so.  With us


                                                           73

1     essentially abandoning the claim, everything is going to

2     shift around.

3               THE COURT:  Yes.

4               MR. FLYNN:  We just need to confer.

5               THE COURT:  Obviously, I would have

6     loved it if we had one drafted out here today.  I think

7     given everything we have got, that is good.

8               If you can get me something in ten days

9     or so.  Only caveat is from the 3rd of August to about

10    the 14th of August, I am gone.  I am out of here.  I

11    won't even think about this case.  If anybody can reach

12    me, I will kill them.

13              Yes?

14              MR. KELLY:  Your Honor, I have been

15    sitting quietly for a while hoping to get an answer to

16    a question.  Having sat up in Washington for two days

17    and going through all these documents, I don't have a

                          Page 76

18 clear answer as to when we are going to get these in a
19 usable format.
20          We can literally almost do nothing from
21 a substantive basis.
22          I heard protocol discussed.  I would just
23 like to know when.  She has to answer that.  I don't --
24          THE COURT:  I heard her say fairly
25 quickly.

74

1          Can you put something on fairly quickly?
2          MS. LATIMER:  Assuming we can get a
3 direction on the protocol and protective order, fairly
4 quickly is where I was.
5          I am uncomfortable when I talk about five
6 million pages or three million pages.
7          THE COURT:  I am terrified.
8          MS. LATIMER:  I am saying a few weeks.
9 I am comfortable on a rolling basis.  If we can get an
10 agreement on those things, particularly starting the
11 production as quickly as two weeks.
12          I can't complete the production of that
13 many millions of pages of documents, Your Honor.
14          THE COURT:  I think a rolling production
15 certainly can be done.  I am not a fan of waiting until

Page 77

16  everything is done.  I think a rolling production gets

17  people started.

18              You have a protective order to come up

19  with fairly quickly.  You have your protocol to discuss

20  with them.  I would like to see us get started, if you

21  have stuff ready, in a couple weeks.

22              I would like to  see it done in a couple

23  weeks.

24              If it goes much over 30 day, I need to

25  get kind of more involved in the process.


75

1              MS. LATIMER:  I will make sure it

2  happens.

3              THE COURT:  Does that help?

4              MR. KELLY:  It does.  I want to know --

5  until we get it the deadlines will be meaningless.  We

6  can't talk to experts until we get them.  It could roll

7  into December.

8              They have had a lot of time to get

9  things ready and they know we want to look at them.

10  We signed confidentiality orders months ago.  I don't

11  see that as an impediment.

12              We can't do anything until we get the

13  documents.

14              THE COURT:  I understood some will be

                    Page 78

15   within two weeks and the rest within 30 days or so.
16   That is what I am getting at.
17              If it goes beyond that, I will start
18   saying what is the hold up.
19              MS. LATIMER:  I don't think they will be
20   able to keep up with the production once we can get it
21   rolling, Your Honor.
22              THE COURT:  The old saying, be careful
23   what you ask for.  I have seen dump trucks.  I did it
24   with grand jury subpoenas they drove up with dump trucks
25   to the building.

                                                          76
1              MS. LATIMER:  That is not our plan.
2              THE COURT:  It is a lot of stuff.  I
3   hope again you will have an electronic form that is
4   searchable and will work.  I like all that.
5              MS. LATIMER:  I think we are heading to
6   the right place.  I don't want to fight about things
7   that haven't happened yet.
8              THE COURT:  Mr. Kelly, I have it as a
9   couple weeks, 30 days.  If it goes beyond that, you
10  have my phone number.  I won't answer until the 14th.
11             Mr. Flynn, that will give you some liaison
12  to work with there.

13                    I am trying to check my notes.

14                    Is there anything else that you can think

15    of that we need to do now?

16                    Very clearly, I am lifting discovery as

17    we speak now on the Tennessee cases and to whatever

18    extent there is an agreement left in discovery as to

19    what is necessary for MDL.  Certainly that goes both

20    ways.

21                    Novartis is entitled to get their

22    requests out and you will be submitting this after

23    this questionnaire and such,  and obviously the

24    plaintiffs will have or should have read and released all

25    their medical records and such.

1                     We are not going to start depositions of

2     just plaintiffs in general until we address that

3     specifically.

4                     I am sure I forgot about 40 things and

5     as soon as we recess, I will think of ten of them that

6     I wish I would have said something.

7                     Let me give you a last chance.  What

8     else do we need to do?

9                     The ideal thing I want is the draft

10    scheduling order to me, in what did I say, two weeks

11    or 10 days?  Let's make it two weeks.

12          You have the 4th and we are almost at
13  the weekend.  Let's go with two weeks.
14          MR. FLYNN:  That seems premature to me.
15          I am trying to listen to Your Honor while
16  Mr. Kelly talking to me.
17          THE COURT:  There is nothing worse than
18  having somebody pull on your coattails when you are
19  trying to think.
20          MR. FLYNN:  Could I speak to him for a
21  minute?
22          THE COURT:  Sure.
23          MR. FLYNN:  Your Honor, I don't think
24  there are any other things.  There is probably a myriad
25  of things to discuss.  We will put that in an order and

78

1  may be back to see you in a few weeks.
2          THE COURT:  I can do things over the
3  telephone, record the calls.  I don't record -- I think
4  this case, if we have a telephone conference, I can
5  record it.
6          Any time I have a telephone conference,
7  I will record it and if somebody wants a transcript,
8  they can make arrangements with the appropriate people
9  to get it.

Page 81

10          I am sure we will have some

11   conversations.  I try to get as quick as I can to the

12   scheduling order.  To the extent there are competing

13   deadlines, I will look at that and I will sign the

14   matter and then send it to Judge Campbell for a trial

15   date.

16          Again, understanding there may be real

17   issues as to what cases -- we have a trial day -- that

18   is fine that we have time to do it.  We have something

19   to start with.

20          Just an aside in this thing, obviously

21   I would like an idea what would be the best estimate

22   or guess of length of one of these trials if we tried

23   one of these cases with a few plaintiffs.

24          Anybody have a guess what the trial

25   length would be?  Are we talking about two weeks, three

79

1   weeks, six week, two days?

2          MR. GERMANY:  Based upon what I know now,

3   probably five million documents, I would think the

4   plaintiffs can put their case on probably within five

5   days, maybe six.

6          THE COURT:  Okay.  Of course, you don't

7   know what their case is going to be per se.  I am not

8   holding you to this.

Page 82

 9                    A rough idea?

10                    MS. LATIMER:  Based upon what I know

11   now, I disagree with that assessment on the plaintiffs'

12   case.

13                    THE COURT:  You think longer?

14                    MS. LATIMER:  I do.  I think it would

15   be a better use for planning purposes for the Court if

16   we recognize that the Court will go three, four weeks

17   on the first trial.  A later trial may be a little

18   quicker.

19                    That is my estimate.

20                    THE COURT:  I am probably sort of the

21   view that the first time through will take a long time.

22   To the extent there is a second trial, it would go

23   quicker because a lot of the issues -- you would know

24   the rulings and things would be streamlined and one

25   side would be trying to change the strategy and the

                                                        80

 1   other side would try to keep the same strategy and

 2   beef it up.

 3                    I think three to four weeks overall is

 4   not a bad estimate.  I know Judge Campbell tried one of

 5   the intellectual property cases involving music and I

 6   think they told him five days and it went ten.

                         Page 83

7                 So, I would rather have him think it is
8       potentially three or four weeks and it would take two
9       or three.  I would rather overestimate than
10      underestimate.
11                I think probably for the estimate three
12      or four weeks.  Who knows at this point.  When it
13      starts it starts and once he starts it he will continue
14      it.
15                I think we have made some progress today
16      and I think, obviously, counsel are going to represent
17      their clients vigorously in this matter and both sides
18      feel they have merit to their positions.  But it looks
19      to me you all are going to get along as can be expected
20      in this.
21                My view is that counsel should disagree
22      about the case but shouldn't be disagreeable among
23      themselves.  One judge said, counsel, go have a good
24      drink after the case is over.  I suggest maybe a good
25      lunch anyway.

                                                        81
1                 Anything I can do to assist to make it
2       easier for you, I will try to do it.  I will try to
3       move things along as best I can.
4                 My marching orders are, try to get the
5       case prepared and move on as quickly as I can.  I will

6    try to do it with your all's assistance.

7                    It is not my particular field of

8    expertise.  I think I am noted for trying to move

9    things along.

10                    I kind of take a common sense approach.

11   If something makes sense, I try to go with it.  If

12   something supports me, I am sure they will find that

13   case that supports me.

14                    I don't write long opinions.  I will

15   decide it and if somebody wants to go up then the Court

16   of Appeals gets paid -- they have more law clerks than

17   I do.

18                    With that in mind, if anybody else has

19   anything to bring up, let me know.

20                    I will put down an order on this one

21   case that didn't show -- and I need to make sure I have

22   that number.  That is 394.  We don't have an attorney.

23                    MS. LATIMER:  Ingram.

24                    MR. FLYNN:  It was, Your Honor.

25                    THE COURT:  I have Ingram, 394.  I don't

82

1    want to shoot the wrong person without finding out what

2    the problem is.  I am surprised -- I thought I was

3    pretty clear in the order designating somebody to be

Page 85

4    here.

5            None of you all are claiming you have been

6    designated?

7            All right.  Going once.  Sold America.

8            _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

1                REPORTER'S CERTIFICATE

2            I, John W. Tummel, Official Court Reporter for
                        Page 86

3  the United States District Court, Middle District of

4  Tennessee, with office at Nashville, hereby certify that

5  I recorded on the Stenograph Shorthand Machine the

6  proceedings held in open court on June 29, 2006, in the

7  matter of: AREDIA AND ZOMETA PRODUCTS LIABILITY

8  LITIGATION; Nashville Civil Case No. 3-06-01760; and that

9  the proceedings in connection with this hearing were

10 reduced to typewriting under my supervision; and that the

11 foregoing is a true and correct transcript of the same.

12

13                              This the 5th day of July, 2006

14

15                              /S/John W. Tummel

16                              _____

17                              Official Court Reporter

18

19

20

21

22

23

24

25

Case 3:06-md-01760   Document 72   Filed 07/05/06   Page 87 of 87 PageID #: 545