# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

_____

IN RE: AREDIA® AND ZOMETA®
PRODUCTS LIABILITY LITIGATION
(MDL No. 1760)

This Document Relates To:
ALL CASES
_____

)
)
)
)
)
)
)
)
)
)

**No. 3:06-MD-1760**

**JUDGE CAMPBELL**

**MAGISTRATE JUDGE BROWN**

## NOVARTIS PHARMACEUTICALS CORPORATION'S
## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' STEERING
## COMMITTEE'S MOTION TO COMPEL NOVARTIS DISCOVERY RESPONSES

Defendant Novartis Pharmaceuticals Corporation ("NPC") opposes "Plaintiffs' Steering Committee's Motion to Compel Novartis Discovery Responses" ("Pls.' Mot."), which raises twenty-two separate matters plaintiffs claim the Court needs to resolve – without citing a single case or any other authority.[1]

Plaintiffs' Motion raises a few issues that are truly in dispute but, on the whole, raises matters never even discussed with NPC or that NPC thought had been resolved or that could be resolved through a good faith meet and confer effort. NPC has been fully engaged in responding to plaintiffs' discovery requests, having produced more than four million pages and continuing to produce at a pace of more than one hundred thousand pages of additional documents every few weeks. NPC has provided witnesses in response to plaintiffs' notices of deposition and has provided narrative responses to most of plaintiffs' interrogatories (except where the interrogatory

_____

[1] In addition to unnecessarily complicating NPC's response, plaintiffs' Motion violates L.R. 7.01, which requires that motions "be accompanied by a memorandum of law citing supporting authorities," as well as L.R. 37.01(a), which requires the submission of a "joint written statement of the matters at issue in the discovery dispute," and L.R. 37.01(b)(2), which requires the movant to "Quote Verbatim" each request and include the "response and the grounds assigned for the objection" in their motion. Plaintiffs also failed to certify – and could not have certified – under L.R. 37.01(b)(3) that they made a good faith effort

was wholly objectionable or required an overly burdensome review of documents).

Plaintiffs failed to embrace the opportunity the Court provided after the December 18, 2006 status conference for the parties to meet and confer further on various issues – particularly those for which a resolution seemed near during the conference (such as the watermarking issue). Instead, plaintiffs have simply refused to consider offered compromises – even those the Court appeared to endorse during the status conference – and simply reproduced their litany of complaints in their Motion.  For the reasons articulated more fully below, the Court should deny all of the relief requested in plaintiffs' Motion.[2]

## DISCOVERY BACKGROUND

Since the entry of the Case Management Order ("CMO") on July 28, 2006 [Docket No. 89], NPC has:  provided responses to extensive written discovery; produced in excess of four million pages of hard-copy documents, electronic documents, and e-mail as images and in searchable format; provided an electronically searchable index of the New Drug Applications ("NDAs"); and offered Rule 30(b)(6) testimony on thirteen separate topics.

Plaintiffs initially raised issues about NPC's written discovery responses by letter on September 8, 2006.  NPC responded on September 26, 2006.  When plaintiffs raised no issues at the status hearing on October 12, 2006, NPC appropriately presumed the disputes had been resolved or abandoned.  On December 4 and 6, 2006, however, plaintiffs sent a series of letters about discovery matters, including all of the matters first raised in September.  On December 11, 2006, NPC responded point-by-point to each of plaintiffs' concerns.  Plaintiffs did not respond. Rather, on December 15, 2006, plaintiffs sent a letter to the Court outlining discovery issues they

to resolve these disputes.
[2]  A "scorecard" of the issues raised by plaintiffs is attached hereto as Exhibit 1.  The "scorecard" summaries reflect the parties' positions based on their prior correspondence regarding each of the issues.

2

wanted heard at the status conference set for December 18, 2006.  NPC responded.  At the

telephonic status conference, the Court ordered the parties to first try to resolve the discovery

issues, and then submit a "scorecard" of those matters remaining unresolved.  Should plaintiffs

be willing to meet and confer with NPC on the pending issues, NPC believes almost all of them

ought to be resolved.

## ARGUMENT

## I. NPC PROPERLY REDACTED PRIVILEGED, PRIVATE, AND IRRELEVANT INFORMATION

NPC redacted information from documents it produced on the basis of:  (1) privilege, (2)

regulatory requirements[3], and (3) irrelevance.[4]  Plaintiffs have not challenged any privilege

redactions in their Motion.[5]  NPC's other redactions are appropriate.

### A. Redactions Based on Irrelevance are Appropriate

Federal courts regularly allow parties to redact unresponsive information contained in

otherwise responsive documents.  *See, e.g., Johnson v. Wendy's Restaurant*, No. 2:05-CV-1060,

2006 WL 3545108, *2, n.4 (S.D. Ohio Dec. 7, 2006) (allowing for redaction of irrelevant

information) (Ex. 2).[6]  NPC offered to discuss redactions made to documents with plaintiffs on a

case-by-case basis, *see* Letter from Katharine Latimer to Bart Valad, Dec. 11, 2006, at 2-3 (Ex.

3), but plaintiffs have not asked NPC to consider removing relevance redactions for any specific

---

[3]  *See, e.g.,* 21 C.F.R. § 20.63.

[4]  This includes, *e.g.*, information about NPC products other than Aredia® or Zometa®.

[5]  NPC has produced a "privilege log" pursuant to Fed. R. Civ. P. 26(b)(5), identifying documents redacted or withheld on the basis of privilege.  No log of relevance and privacy redactions is required. NPC produced all documents containing irrelevant or protected information in redacted form (even if the whole document is redacted because, for example, it was misfiled by the custodian among responsive documents).  Plaintiffs can easily determine which documents contain redactions.

[6]  *See also Concepcion v. City of New York*, No. 05-8501, 2006 WL 2254987, *3 (S.D.N.Y. Aug. 4, 2006) (discovery obligations satisfied where irrelevant portions of responsive documents were produced in redacted form) (Ex. 4); *Kovacs v. Hershey Co.*, No. 04-01881, 2006 WL 1980291, *17 (D. Colo. Jul. 13, 2006) (same) (Ex. 5).

Case 3:06-md-01760   Document 260   Filed 01/16/07   Page 3 of 27 PageID #: 3316

documents. Had they done so, NPC could have, for example, provided a partially unredacted copy of plaintiffs' Exhibit 14.[7] Instead of meeting and conferring about these documents, however, plaintiffs addressed them for the first time in their motion to compel. The Court should reject plaintiffs' request that it order NPC to produce all of these documents without redactions, Pls.' Mot. at 2-3, and instead require the parties to meet and confer about specific redactions.

### B. Redacting the Identities of Non-NPC Employee Professionals Is Justified

Plaintiffs demand that the Court order NPC to reproduce all documents on which NPC redacted the names of non-NPC employees. Pls.' Mot. at 7-8. On December 11, 2006, NPC offered to give plaintiffs unredacted copies of the NDAs for both Aredia® and Zometa® so plaintiffs could identify non-NPC employees involved in the drugs' development. *See* Latimer 12/11/2006 Letter at 3 (Ex. 3). NPC sought two reasonable conditions on this disclosure: (1) if the name of a patient or adverse event reporter protected by 21 C.F.R. § 20.63(f) were inadvertently revealed, plaintiffs would immediately inform NPC and not use that information, and (2) plaintiffs would inform NPC before contacting any non-NPC employees.

NPC is obligated to protect the identities of non-NPC employees involved in clinical trials,[8] but is willing to discuss conditions under which it may satisfy its obligations to those persons while accommodating plaintiffs' request. If plaintiffs have as their goal the determination of the names of non-NPC employees involved in drug development, they need go no further than what NPC has offered – the opportunity to review the unredacted NDAs for

---

[7] Exhibit 14 to plaintiffs' Motion is an organizational chart; only small parts of the chart contain marginally relevant information. NPC will provide a partially redacted version of Exhibit 14.

[8] Other courts have recognized that the names of third-party (non-employee) clinical trial investigators may be redacted from documents produced in response to discovery requests. *See In re Rezulin Products Liability Litigation*, No. 00-2843, 2000 WL 1839744, at *2 (S.D.N.Y. Dec. 13, 2000) (Ex. 6); *In re Rezulin Products Liability Litigation*, No. 00-2843, 2002 WL 102601, at *1 (S.D.N.Y. Jan. 25, 2002) (Ex. 7); *In re Zyprexa Products Liability Litigation*, No. 04-MDL-1596, 2004 WL 3520247, at *1 (E.D.N.Y. Aug. 9, 2004) (Ex. 8).

4

Aredia® and Zometa®.[9]

## II. NPC'S GENERAL OBJECTIONS AND PRELIMINARY STATEMENT ARE APPROPRIATE

Without citing any authority, plaintiffs ask the Court to strike NPC's preliminary

statement and general objections. Pls.' Mot. at 3-4. As the Preliminary Statement included with

NPC's responses to interrogatories and document requests makes clear, these sections were

intended to (1) streamline NPC's objections to particular interrogatories, (2) point out that

plaintiffs' requests failed to satisfy the Court's admonition that broad and unlimited requests be

avoided, and (3) actually explain how NPC searched for responsive documents and to describe

what NPC was (and is) producing.[10]

In its responses, NPC enumerated a set of initial objections and referred to those

objections in responding to specific discovery requests. NPC adopted this approach to avoid

repeating the text of the same objections throughout the responses while tailoring the objections

to each individual request.[11] They were not asserted in a "boilerplate" manner. NPC objections

based on relevancy,[12] privilege,[13] work-product[14], and undue burden and/or cost[15] are

_____

[9] Exhibit 13 to plaintiffs' Motion, which contains three discrete documents, was properly redacted. Two of the documents contain the names of non-Novartis employee professionals, and are part of substantive documents that were produced. The third document, which contains irrelevant information, is part of a larger responsive document that was produced. Exhibit 15 to plaintiffs' Motion, the substance of which was produced, is missing only the names of non-Novartis employee professionals but, because it appears to be a scientific article, NPC will provide an unredacted copy.

[10] *See* NPC's First Supp. Objections and Resps. to Pls.' First Reqs. for Produc. to Def. (Ex. 9); NPC's Second Supp. Resps. to Pls.' First Set of Interrogs. (Ex. 10). The text of specific interrogatories at issue and NPC's responses thereto, is contained in Exhibit 11. The text of specific requests for production and NPC's responses thereto is contained in Exhibit 12.

[11] *Compare* NPC's response to Interrogatory 12 (asserting general objections 1, 3, 4, 5, and 6) *and* NPC's response to Interrogatory 13 (asserting general objections 4, 5, and 6) *with* NPC's response to Interrogatory 8 (asserting no general objections).

[12] Fed. R. Civ. P. 26(b)(1); *see Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373, 2003 WL 23407605, *3 (W.D. Tenn. Dec. 2, 2003) (relevancy objections were proper) (Ex. 13).

[13] Fed. R. Civ. P. 26(b)(1); *see Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) (attorney-client privilege).

Case 3:06-md-01760   Document 260   Filed 01/16/07   Page 5 of 27 PageID #: 3318

unquestionably legitimate, as are objections on the grounds the information requested is not within NPC's possession, custody or control[16], the information is equally available to plaintiffs as it is to NPC,[17] and the information requested (*e.g.,* the identities of patients, physicians and/or reporters) is otherwise protected by federal law.[18] Plaintiffs fail to offer any arguments disputing the validity of these individual objections to interrogatories such as Interrogatory 12, which seeks a "full[]" description of "all tests . . . related in any manner to the drug" conducted in decades. *See* Ex. 10 at 24.

The Court should deny any request by plaintiffs to strike NPC's Preliminary Statement, Document Production Protocol, or general objections or any other objections in NPC's responses to discovery from NPC's discovery responses.[19]

## III. NO DISPUTE REMAINS ABOUT NPC'S WATERMARK

Plaintiffs contend the "MDL" watermark NPC placed on the documents produced obscures the text and seek a reproduction without the watermark, solely at NPC's expense. Pls.' Mot. at 4-5. While the CMO expressly authorizes the "watermark," CMO at 27, NPC has already agreed that it will not watermark future productions, *see* Tr. of 12/18/2006 Telephone Conf. ("Hrg. Tr.") at 26 (Ex. 14), and agrees with the Court that it is appropriate for NPC to re-

---

[14] Fed. R. Civ. P. 26(b)(5); *see In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997) (work product privilege).

[15] Fed. R. Civ. P. 26(b)(2)(B) (applicable, in particular, to the production of electronic data).

[16] Fed. R. Civ. P. 34(a); *see, e.g.*, *Norman v. Young*, 422 F.2d 470, 472-73 (10th Cir. 1970) (requesting party must show control).

[17] *Struthers Scientific & Int'l Corp. v. General Foods Corp.,* 45 F.R.D. 375, 380 (S.D. Tex. 1968) (public information).

[18] *See* 21 C.F.R. § 20.63.

[19] Plaintiffs are not entitled to audit NPC's production; there is a presumption of regularity in a party's identification and production of responsive documents absent evidence to the contrary. *See In re Ford Motor Company*, 345 F.3d 1315, 1316-17 (11th Cir. 2003) (presumption of regularity in discovery responses absent evidence of improper conduct); *Powers v. Thomas M. Cooley Law School*, No. 5:05-CV-117, 2006 WL 2711512, at *5 (W.D. Mich. Sept. 21, 2006) (same) (Ex. 16).

produce without a watermark any previously produced document where the watermark actually obscures the text. *Id.* at 30. NPC also offered to produce the entire collection again without a watermark under a cost sharing arrangement with plaintiffs. *See* Letter from Katharine Latimer to Bart Valad, Dec. 11, 2006 at 3 (Ex. 15); *see also* Hrg. Tr. at 21. At the December 18, 2006 hearing, the Court recognized plaintiffs delayed raising this issue for four months while hundreds of thousands of pages of documents were produced and indicated that the parties should get together and talk if plaintiffs wanted to obtain the entire production without a watermark. *Id.* at 28-31.

NPC thought that the parameters of a resolution of this issue were clear after the December 18 hearing and awaited word from plaintiffs regarding whether they would identify obscured documents or participate in the costs of a total reproduction. Instead, plaintiffs ignored the Court's suggestion to meet and confer further on this issue and have moved to obtain a complete reproduction without sharing the cost.[20] NPC stands ready to reproduce the entire production without watermark and asks only that the Court require plaintiffs to share in the cost of this reproduction, which NPC expects will be approximately $3,500[21] In the alternative, NPC will reproduce any document identified by plaintiffs on which the watermark renders text illegible at no cost to plaintiffs.

## IV.    NPC HAS DISCLOSED THE "CORE" AND "FIFTY" EMPLOYEES

NPC has provided plaintiffs a comprehensive list of those NPC employees and counsel interviewed for purposes of this litigation and from whom NPC collected potentially responsive

---

[20]  Plaintiffs offer a declaration from their electronic discovery consultant indicating, essentially, that it would take "eight to sixteen hours" to reproduce the collection – although the affidavit admits that he "lack[s] . . . familiarity with [NPC's] files." *See* Pls.' Mot., Ex. 19, Altman Declaration at ¶ 23.

[21]  Plaintiffs' counsel's claim at the December 18 hearing that NPC had advised the PSC the re-production would "range between $45,000 and $90,000" (Hrg. Tr. at 30) is insupportable and flatly wrong.

Case 3:06-md-01760   Document 260   Filed 01/16/07   Page 7 of 27 PageID #: 3320

documents.  *See* Letter from Robert Johnston to Bart Valad, December 12, 2006 (Ex. 17).  NPC told plaintiffs that these individuals have discoverable information in the case and were designated as part of NPC's Initial Disclosure under Rule 26(a)(1)[22] and in response to Interrogatories 27 and 28.[23]  *Id.*  From the beginning of the litigation, NPC told plaintiffs this group numbered "more than fifty"—not a limiting exercise but rather a reflection of the very substantial scope of the base production.  *See, e.g.,* Letter from Katharine Latimer to Bart Valad, Sept. 26, 2006 at 2 (Ex. 18).  In addition, NPC repeatedly told plaintiffs how NPC selected these employees for interviews, the criteria used to locate potentially responsive documents, and the reasoning behind reducing that number to fifteen "core" employees for e-mail production.  *See, e.g.,* Latimer 12/11/2006 Letter at 1-2 (Ex. 3); Latimer 9/26/2006 Letter at 2-4 (Ex. 18).  NPC has been transparent and straightforward.

Had plaintiffs requested the "job titles, positions, or duties" of these individuals before raising it with the Court, NPC would have given reasonably available information about these current and former employees – and is willing to do so now.  NPC has met its initial disclosure requirements and has reasonably responded to those interrogatories seeking the identities of persons with information about the cases.  The Court should deny the relief requested by the plaintiffs.

## V.  NPC PROPERLY DESIGNATED DOCUMENTS IN RESPONSE TO INTERROGATORIES

Federal Rule of Civil Procedure 33(d) authorizes NPC to designate documents in response to a number of plaintiffs' interrogatories because the response "may be derived or

---

[22]  NPC identified four persons in its Rule 26(a)(1)(A) initial disclosure prior to the creation of this MDL. Those disclosures were adopted as the MDL initial disclosure.  *See* CMO at 15.  NPC's recent disclosure of sixty-plus names satisfied its obligation to disclose persons with discoverable information NPC "may use" at trial.  Rule 26(a)(1)(A).

[23]  Interrogatory 28 is unduly burdensome because it would require NPC to summarize the knowledge of

ascertained from [NPC's] business records" and "the burden of deriving or ascertaining the answer is substantially the same for [plaintiffs] as for [NPC]." NPC designated the documents "in sufficient detail to permit [plaintiffs] to locate and to identify, as readily as [NPC], the records from which the answer may be ascertained," Fed. R. Civ. P. 33(d). *See United States v. Rachel*, 289 F. Supp. 2d 688, 693 (D. Md. 2003) (33(d) designation of 175 boxes proper in response to broadly worded interrogatories); *Mid-America Facilities, Inc. v. Argonaut Ins. Co.*, 78 F.R.D. 497, 498 (E.D. Wis. 1978) (designation proper where review would take same time for each party); *Concept Indus., Inc. v. Carpet Factory, Inc.*, 59 F.R.D. 546, 548-49 (E.D. Wis. 1973) (allowing designation where review of 30,000 documents would require 1000 man hours).

NPC did not indiscriminately refer plaintiffs to "six million documents" in NPC's production – as plaintiffs suggest. Pls.' Mot. at 8. In each of the twenty-one interrogatories in which NPC designated documents, specific collections within the production were identified, including the NDAs, documents obtained from designated custodians of records, and even plaintiffs' own documents.[24] NPC also gave plaintiffs extensive finding aids, including an index of the NDA and computer files that permit full text searching of all documents produced. Further, NPC gave narrative answers to fourteen of the twenty-one interrogatories to which NPC also designated documents as responsive.

Moreover, NPC's designation of responsive documents differs from interrogatory to interrogatory. Plaintiffs seek relief in this motion without addressing the documents designated in response to each individual interrogatory. Plaintiffs also ignore NPC's burden objections to requests like Interrogatory 12, which asks NPC to "describe all tests . . .  related in any manner"

more than sixty employees and former employees in narrative form.

[24] *See* Ex. 10 (NPC designated specific documents pursuant to Fed. R. Civ. P. 33(d) in response to Interrogatories 1, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 27, and 28).

9

to the drugs at issue.  *See, e.g.*, *Coleman v. American Red Cross*, 23 F.3d 1091, 1097-98 (6th Cir. 1994) (unduly burdensome to require review of substantial number of documents to answer interrogatories); *see, e.g.*, NPC's Response to Interrogatory 11 (asserting burden objection).  If plaintiffs wish to challenge NPC's designation of documents in response to interrogatories, they should do so on an interrogatory-specific basis.

## VI.   NPC HAS RESPONDED TO INTERROGATORIES SEEKING THE IDENTITY OF PERSONS SUPERVISING THE TESTING OF AREDIA® AND ZOMETA®

Plaintiffs claim that "Novartis has refused to identify the persons supervising the testing of the drugs" and "instruct[ed] Plaintiffs to look through six million pages of documents" to find their identities is false.  Pls.' Mot. at 9.  NPC referred to and produced the NDAs for Aredia® and Zometa®, which contain this information, re-produced these documents in electronically searchable format, produced documents from persons knowledgeable about the range of clinical activity associated with Aredia® and Zometa®, provided a list of twenty persons who were responsible for animal testing and clinical trials at a deposition, and has now expanded that list to include the responsibilities of those persons and all trial investigators.[25]

## VII.  NPC HAS RESPONDED APPROPRIATELY TO INTERROGATORY 12, SEEKING INFORMATION REGARDING TESTING PERFORMED ON THE DRUGS

NPC did not "refuse[] to answer," Interrogatory 12.  NPC designated as responsive NDAs for Zometa® and Aredia® and documents obtained from several records custodians.  *See* NPC's Second Supp. Resps. to Pls.' First Set of Interrogs. at 24 (Ex. 10).  The NDAs contain

---

[25]  Because NPC responded to this interrogatory, plaintiffs are not entitled to an order under Fed. R. Civ. P. 37(b)(2) "stating that NPC's record keeping is incomplete and that NPC has no record of who, if anyone, supervised the testing of the drugs." (Pls.' Mot. at 10).  *See R.W. Intern. Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) (holding a court can not impose sanctions under Rule 37(b) unless, first, a court order is in place and, second, the party to be sanctioned violated that order); *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1362 (Fed. Cir. 1990) (applying Sixth Circuit law and holding even if party "responds by objecting, Rule 37(d) sanctions are not available").

Case 3:06-md-01760   Document 260   Filed 01/16/07   Page 10 of 27 PageID #: 3323

detailed information on all animal testing and clinical trials undertaken on each drug. NPC incorporated by reference its response to Interrogatory 14, which identified ongoing Zometa® studies that contained protocols for monitoring for ONJ. *Id.* at 25. NPC further gave plaintiffs an index of Bates ranges for the NDAs to aid plaintiffs in finding the study and trial reports. In addition, in meet and confer correspondence in September 2006, NPC pointed plaintiffs to Integrated Summary of Safety ("ISS") reports, which are contained within the NDA.[26] These ISS reports provide summary information on testing and trials associated with Aredia® and Zometa®. NPC referred as appropriate to records custodians because the interrogatory seeks a "full[]" description of "all tests . . . related in any manner to the drug" conducted over a decades long period.

Apparently, plaintiffs want NPC's response to contain a narrative summary of the animal testing and clinical trials undertaken over the past twenty years on Aredia® and over the past ten years on Zometa®. NPC is not aware of any other documents in its possession that summarize these studies and trials. To generate such a summary, NPC would have to review the documents in the NDAs related to each of the studies and trials, then summarize them. The burden of preparing such a summary is the same for the plaintiffs as it is for NPC. Moreover, NPC's designation of documents containing responsive information is appropriately narrow and precise. Accordingly, pursuant to Rule 33(d), NPC's response to this interrogatory is full and complete and no further response is required.

---

[26] Aredia® Integrated Summary of Safety reports are located in the documents provided to plaintiffs at the following Bates ranges: ANDA-0055205 to ANDA-0055238; ANDA-0078415 to ANDA-0078475; ANDA-0114356 to ANDA-114413; ANDA-0123195 to ANDA-0123284; ANDA-0154814 to ANDA-0154918; and ANDA-0294618 to ANDA-0294695. Zometa® Integrated Summary of Safety reports are located in the documents provided at the following Bates ranges: ZNDA-0091445 to ZNDA-0091558; ZNDA-0123453 to ZNDA-0123595; and ZNDA-0180931 to ZNDA-0181025.

## VIII. NPC ANSWERED INTERROGATORY 13 REGARDING DENTISTS/"ORAL CAVITY SPECIALISTS" IN CLINICAL TRIALS

NPC properly answered Interrogatory 13, which seeks the identity of "dentists, oral surgeons, maxillofacial surgeons and oral cavity specialists" who participated in pre-marketing animal testing or clinical trials of the drugs at issue.[27]  Pursuant to Fed. R. Civ. P. 33(d), NPC has designated as responsive the New Drug Applications ("NDAs") for Zometa® and Aredia®, which contain detailed information on all animal testing and clinical trials undertaken on each drug, including the identities of study participants.  NPC also gave plaintiffs an index of Bates ranges for the NDAs to aid plaintiffs in finding the study and trial reports.

After a reasonable inquiry, NPC is not able to state today whether any dentists, oral and maxillofacial surgeons, periodontists, or endodontists participated in animal studies or clinical trials.[28]  In order to answer this interrogatory, NPC would have to review the study and trial reports themselves.  Because the burden of doing so is the same for the plaintiffs as for NPC, NPC's response to this interrogatory is full and complete and no further response should be required.[29]

## IX. NPC'S RESPONSE TO INTERROGATORY 16 SEEKING IDENTITY OF CONSULTANTS RESEARCHING THE SAFETY OF THE DRUGS WAS APPROPRIATE

Interrogatory 16 seeks the identities of all consultants "utilized by you" for any purpose with reference to researching the safety, effectiveness or use of the drug or the potential side effects of or adverse reactions to the use of the drug.  This request potentially seeks the identity

---

[27]  NPC objected to this interrogatory on the grounds that the phrase "oral cavity specialists" is undefined and subject to various interpretations, among other objections.

[28]  NPC does not agree that the lack of participation by a dentist or "oral cavity specialist" in animal testing or clinicals would constitute negligence in the testing of these oncology drugs.

[29]  Because NPC did, in fact, respond to this interrogatory, plaintiffs are not entitled to any order precluding the admission of evidence on this issue absent a prior order compelling disclosure of such information.  *See supra* n. 18.

of any professional associated in any way with the testing and post-marketing surveillance or investigation of Aredia® and Zometa® over a period of more than sixteen years. By its terms this request seeks irrelevant information as it is not limited to the identity of professionals involved with ONJ but seeks the identity of any professional involved with any reported side effect or adverse reaction to the drug. Information about adverse events other than ONJ is simply not relevant to any claim or defense in this litigation. Fed. R. Civ. P. 26(b)(1). Based on burden and relevance objections, NPC was entitled to refuse to answer this interrogatory until it was appropriately narrowed by plaintiffs (which still has not occurred).

Nevertheless, in an effort to move discovery forward, NPC noted that the identities of such persons, to the extent that they exist, are likely to be contained in documents obtained from three custodial sources. NPC does not have a roster or list of persons meeting the stated criteria and would have to review documents to provide a full and complete response. NPC sufficiently identified the locations in which plaintiffs should search and narrowed the scope of documents plaintiffs should review to those documents. Accordingly, even though it was not required to respond to this burdensome interrogatory, NPC's response fully satisfies the requirements of Fed. R. Civ. P. 33(d) and plaintiffs' requests that NPC be required to provide a further response to this interrogatory should be denied.[30]

## X. NPC RESPONDED APPROPRIATELY TO INTERROGATORY 19 SEEKING STUDIES REGARDING CAUSAL CONNECTION TO ONJ

NPC responded fully to this interrogatory. NPC's Second Supp. Resps. to Pls.' First Set of Interrogs. at 30 (NPC stating "since 2002, . . . NPC has designed, and is in the process of designing, prospective studies to investigate the association, if any, between ONJ and the use of

---

[30] Because NPC provided a response to this interrogatory, plaintiffs are not entitled to an order that no such persons exist. *See supra* n. 18.

[Aredia® or] Zometa®.").  NPC also indicated that it "is in the process of developing prospective trials that will include protocols to address ONJ."  *Id.*  Finally, NPC incorporated by reference its response to Interrogatory 14, which identified a number of ongoing trials, studies and a chart review.  NPC's response was full and complete.  Plaintiffs contend that they "cannot determine from Novartis' response what studies Novartis has designed and is in the process of designing, and whether these studies are otherwise identified in Novartis' response."  Letter from Bart Valad to Katharine Latimer, Sept. 8, 2006, at 5 (Ex. 19).  More recently, plaintiffs stated only that they "do not agree that NPC's answer is complete" without explaining what additional information they contend is missing.  Letter from Bart Valad to Katharine Latimer, Dec. 4, 2006, at 3 (Ex. 20).  Plaintiffs are simply wrong when they state in their Motion that NPC "offers no specifics or details" in response to this interrogatory.  Pls.' Mot. at 11.  NPC's response to this interrogatory was full and complete at the time it was made, and plaintiffs have not established that they are entitled to an order compelling a further answer.

## XI.  NPC NEED NOT RESPOND TO INTERROGATORY 26 REGARDING OTHER LAWSUITS

Plaintiffs demand that NPC create a list of lawsuits relating to the drugs at issue and the counsel representing each party.  Notably, plaintiffs' motion does not identify how the information sought by this interrogatory is relevant under Fed. R. Civ. P. 26(b)(1).  In fact, other lawsuits are not relevant due to the widely varying factual circumstances underlying the claims of each individual plaintiff alleging injury and the hearsay nature of legal complaints.  Moreover, as NPC repeatedly has advised the Court and parties on the record, the great majority of the cases are pending in federal court and are therefore known, or will imminently be known, to the PSC, such that a demand for a list is merely a make-work exercise.  Plaintiffs have not shown that the objections NPC raised are invalid or established that they are entitled to this information.

## XII.   FOREIGN CORRESPONDENCE RELATING TO THE DRUGS

Plaintiffs want NPC to produce all "correspondence between any corporate affiliate or parent of NPC and any foreign government or agency regarding the drugs" in response to Document Request 10.  Pls.' Mot. at 12.  Plaintiffs do not explain how documents of non-party, foreign corporations are relevant here.  *See Wheeling Steel Corp. v. American Rolling Mill Co.*, 82 F.2d 97, 99 (6th Cir. 1936) ("The plaintiff must of course show that the answers will be relevant to the issues at law . . . ."); *Alexander v. FBI*, 194 F.R.D. 316, 325 (D.D.C. 2000) ("[T]he party seeking to compel information must first demonstrate its relevance.").  Plaintiffs already have in their possession copies of reportable adverse events that occurred in foreign countries.  Moreover, plaintiffs' request would require burdensome searches of the records of a number of large foreign corporations in numerous locations, who are only related to NPC by virtue of a common parent corporation.  Much of this burden would fall upon foreign corporations not party to this litigation.  Rule 26 does not authorize fishing expeditions of this nature.  *See, e.g., Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189, 192-93 (1st Cir. 2001).  Moreover, plaintiffs have not met – and cannot meet – their burden to show that NPC has the "possession, custody or control" of documents of non-party foreign corporations.  *See In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995) (defining "possession, custody or control" under Rule 34 as "*actual* possession, custody or control, or ha[ving] the legal right to obtain the documents on demand") (emphasis in original); *Norex Petroleum LTD v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 55-56 (D.D.C. 2005) (concluding domestic subsidiary corporation did not have legal control of affiliated corporations' documents).  Plaintiffs' motion to require the production of documents in the possession of NPC's foreign affiliates should be denied.

Case 3:06-md-01760   Document 260   Filed 01/16/07   Page 15 of 27 PageID #: 3328

## XIII.  DISCOVERY OF SALES & PROFIT INFORMATION IS, AT BEST, PREMATURE

The revenue and profit information sought by plaintiff in Document Requests 35 and 36 is irrelevant to any issues other than, perhaps, punitive damages.  Because such documents contain information that its competitors could use to NPC's disadvantage, such discovery should be postponed until plaintiffs can show a factual basis to support their claim for punitive damages.[31]  This approach, required by statute in many states,[32] has been approved in several recent federal court opinions.  *See Wells v. EPES Transp. Sys., Inc.*, No. 05-149, 2006 WL 1050670, at *1-2 (E.D. Tenn. Apr. 20, 2006) (deferring discovery of defendant's financial condition until plaintiff can show, through merits discovery, that factual basis for punitive damages exists) (Ex. 21); *Cook v. Caywood,* No. 04-2139, 2004 WL 3142221, at *1-2 (W.D. Tenn. Dec. 15, 2004) (same) (Ex. 22); *Treace v. UNUM Life Ins. Co.*, No 03-2409, 2004 WL 3142215, at *7-8 (W.D. Tenn. Aug. 10, 2004) (same) (Ex. 23).  Moreover, recent U.S. Supreme Court cases suggest the discovery sought by plaintiffs is neither relevant nor admissible as support for a punitive damages award.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427 (2003) (lower court's reliance on "State Farm's enormous wealth" constituted "a departure from well-established constraints on punitive damages"); *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994).  The Court should deny plaintiffs' Motion on this issue.

---

[31]  Plaintiffs contend that such information also informs NPC's "motive," but fail to explain how NPC's "motive" is relevant to any issue other than punitive damages.  Plaintiffs also baldly assert that the discovery sought is relevant to plaintiffs' request for class certification, but fail to articulate what relevance this discovery would have to that issue or to cite any cases supporting such a conclusion.

[32]  *See, e.g.,* Cal. Civ. Code § 3295 (2006); Fla. Stat. § 768.72 (2006).

**XIV. NPC HAS NO OBLIGATION TO PROVIDE AN INDEX OF DOCUMENTS BEING PRODUCED**

Plaintiffs admit that an "'index' to individual e-mails would be burdensome for defendant to produce . . . ." Pls.' Mot. at 13. Plaintiffs refuse to acknowledge that the same burden applies to any other index they seek, *viz.*, "files and electronic documents being produced from individual custodians." *Id.* NPC repeatedly told plaintiffs that no such indices of these documents exist. NPC collected the information (electronic and hard-copy) precisely in the way in which it was kept in the ordinary course of business and produced it in that manner. If a document was in a folder marked "Correspondence," then the folder itself as well as its contents were produced as images. NPC has no way to create a file and folder index of hard-copy documents other than by reviewing the entire collection page by page to identify file and folder breaks and noting file topic information. NPC simply is not obligated to provide such an index, and plaintiffs do not cite any authority in support of their claimed right thereto. *See Hagemeyer N. Am., Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 597-98 (E.D. Wis. 2004) (concluding defendant produced documents in the usual course of business by providing stacked, labeled boxes in the organization existing at defendant's facility). As to the electronic documents, NPC possesses (for most documents) "path" metadata that identifies the source directory from which the file was obtained but, as discussed below, such metadata is presumptively not discoverable and plaintiffs have made no effort to overcome that presumption here.

Moreover, NPC has provided objective bibliographic coding for the hard-copy files it produced. This means that for each hard-copy document there are the following searchable and sortable fields, to the extent they exist on the document: "To"; "From"; "Date"; "Subject or Re: Line"; and "CC". If plaintiffs wish to "identify the contents of the individual custodians' files

that are being produced," Pls. Mot. at 13, they need only review those files.  NPC also provided

extracted text and OCR files to facilitate full text searching of its production.  NPC met its

obligation to produce files in searchable format pursuant to the Document Production Protocol of

the CMO.  NPC has discharged its obligations to produce the documents in the manner they were

maintained.

## XV.  NPC HAS NO OBLIGATION TO PRODUCE THE DATA SOUGHT BY PLAINTIFFS

To avoid *post hoc* electronic discovery disputes, the parties agreed to a Document

Production Protocol specifying the forms in which electronically stored information would be

produced.  *See* Letter from Robert Germany to Katharine Latimer, August 14, 2006 (Ex. 24).

The agreed protocol provides that NPC will produce images of all hard-copy and electronic

documents in .TIF format along with OCR or extracted text files for most documents.  CMO at

25-29.[33]  The Court made the Document Production Protocol part of the CMO over five months

ago.  NPC's production of more than four million pages of e-mail and electronic documents

followed the Protocol.  Plaintiffs do not dispute this fact.  Nor do plaintiffs dispute that NPC

produced the information they seek.  Indeed, they admit that they can "see" the information they

demand in the materials NPC produced.  *See* Pls.' Mot. at 14-15.  Moreover, NPC provided

computer files that permit plaintiffs to search for a particular employee's e-mails on a particular

date, for example.

Plaintiffs' complain they must sort the produced information themselves if they want, for

example, to organize a particular NPC's employee's e-mails by date.  *See* Pls.' Mot. at 13-15.

---

[33]  Production in TIF format "complies with the ordinary meaning of Rule 34." Sedona Principles, Cmt. 9.a., illus. i; *see also* Cmt. 12.c.  ("[P]roducing electronic data in a commonly accepted image format (paper, PDF, or TIF) should be sufficient in most cases."); *see also Ad Hoc* Committee for Electronic Discovery Default Standard, United States District Court for the District of Delaware, available at http://www.ded.uscourts.gov/ OrdersMain.htm (establishing PDF or TIFF as default rule for production

But plaintiffs cannot demand NPC redo its entire production-to-date and undertake the expensive, burdensome, and, ultimately, duplicative task of re-producing the same documents with certain information produced in electronically searchable fields, solely because they apparently decided they want to manage their own internal discovery processes differently now. The time for plaintiffs to raise this issue was months ago, before an agreement was reached, the Court entered an Order, and NPC began producing millions of pages of information – or, at worst, immediately thereafter pursuant to plaintiffs' asserted "right to object in the future." *See* (Ex. 24). Moreover, the metadata plaintiffs now demand is presumptively not required to be produced. *See* Sedona Principles, Cmt. 12.a. (noting modest presumption against production of metadata unless relevant to an issue in dispute); *Williams v. Sprint*, 230 F.R.D. 640, 652 (D. Kan. 2005) (recognizing the "emerging standards of electronic discovery appear to articulate a general presumption against the production of metadata"). Indeed, NPC specifically objected to the production of this kind of electronic data – from the beginning (January 6, 2006) – with no complaint by plaintiffs. *See* NPC's Second Supp. Resps. to First Set of Interrogs., at 3-4 (Ex. 10). NPC is not obligated to provide the data requested by plaintiffs.

## XVI.     PLAINTIFFS' REQUEST FOR COURT INTERVENTION REGARDING TECHNICAL PRODUCTION PROBLEMS IS PREMATURE

Plaintiffs' request that the Court weigh in on various technical production issues (missing Bates numbers, missing OCR files, and missing coding information) is premature. Plaintiffs did not raise these issues until December 6, 2006, and did not provide Bates numbers of the documents allegedly suffering from these deficiencies until 5:30 p.m. on December 29, 2006. *See* Letter from Bart Valad to Katharine Latimer, Dec. 6, 2006 at 1-4 (Ex. 25); Letter from Bart Valad to Katharine Latimer, Dec. 29, 2006 (Ex. 26). NPC is working diligently to address these

---

of electronically stored information).

issues and has assured plaintiffs that it will rectify any technical errors in the production identified by plaintiffs.

## XVII.  NPC IS PROVIDING INFORMATION REGARDING THE M.D. ANDERSON CHART REVIEW

In its discovery responses, NPC advised plaintiffs that the M.D. Anderson Cancer Center at the University of Texas is conducting a retrospective chart review looking at ONJ.  Prior to providing the discovery responses at issue in plaintiffs' Motion, NPC provided plaintiffs with copies of an abstract and PowerPoint presentation of interim results of that chart review at the American Society for Bone and Mineral Research 2005 ("ASBMR") annual meeting.  In its responses, NPC told plaintiffs how to access on the Internet an abstract associated with a similar presentation to the 2005 annual meeting of the American Society of Clinical Oncology ("ASCO").  NPC subsequently provided plaintiffs a poster and abstract of a presentation at the summer 2006 ASCO meeting updating results of the chart review (each of which is publically available on the Internet), as well as a second PowerPoint presentation (which is not publically available).  In the correspondence accompanying the ASBMR materials, NPC stated it would seasonably supplement this information and provide the data collected during the chart review to plaintiffs (to the extent that M.D. Anderson provides that data to NPC) when the chart review is final.[34]

To NPC's knowledge, the analysis of the chart review is not final and has not been published.  When it is, NPC will make available the results and data in its possession regarding this project.  NPC also has made available documents in the possession of various custodians regarding this project and will seasonably supplement its production of such documents in the

---

[34]  *See Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1265-79 (7th Cir. 1982) (probative value of interim data was minimal and outweighed by burden of production and potential interference with academic freedom).

future.  Plaintiffs have articulated no grounds for this Court to impose any obligation to supplement more frequently or in a manner other than that embodied in Rule 26(e)(2) and the Court should decline plaintiffs' request for an order on this issue.

## XVIII.        NPC IS DILIGENTLY PROVIDING DOCUMENTS

During the December 18, 2006 telephonic status conference, the Court indicated that it had no problem with the pace of the rolling production of documents in this case.  Hrg. Tr. at 23. A rolling production gets documents to plaintiffs quickly while accommodating NPC's right to review the documents for privilege and relevance and its regulatory obligation to protect reporters and patients suffering adverse events under 21 CFR § 20.63.  NPC commenced the production on August 22, 2006, and has provided plaintiffs with additional documents approximately every two weeks since.[35]  NPC is diligently pursuing the production of the remaining documents in its initial production.  NPC also will have to conduct periodic re-sweeps and supplement the production because the two pharmaceutical products at issue in these cases continue to be marketed.

Plaintiffs' suggestion that they have been prejudiced by the rolling production is unsupported.  At the telephonic hearing in December, plaintiffs admitted that their attorneys only began reviewing documents thirty days before the hearing.  Hrg. Tr. at 29.  Plaintiffs do not contend that they require the completion of this production before the deadline for class-certification discovery, and the current schedule contemplates a substantial additional period of fact discovery after the close of class-certification discovery.  The Court should reject plaintiffs'

---

[35]  NPC's electronic production to date has occurred on 8/22/06 (627,892 pages); 8/24/06 (460,359 pages); 8/31/06 (251,000 pages); 9/17/06 (134,359 pages); 9/26/06 (161,256 pages); 10/3/06 (292,485 pages); 10/12/06 (205,406 pages); 10/20/06 (222,847 pages); 10/27/06 (147,972 pages); 11/3/06 (130,173 pages); 11/10/06 (120,126 pages); 11/17/06 (220,335 pages); 12/7/06 (157,048 pages); 12/28/06 (159,596 pages); 1/05/07 (159,592 pages).

demand that it enter an order setting a date certain by which NPC's production of documents must be completed.

## XIX.  NPC'S WITNESSES HAVE PROVIDED ALL INFORMATION ON TOPICS FOR WHICH THEY HAVE BEEN DESIGNATED

NPC gave plaintiffs information they requested concerning NPC's document and data retention policies, persons supervising clinical trials and animal testing, and corporate organization in both written form and through testimony of two witnesses.

Six weeks after the deposition of Mr. Mark Pellechio, plaintiffs claimed for the first time that Mr. Pellechio was unable to answer certain questions at his deposition.  Letter from Bart Valad to Katharine Latimer, Dec. 4, 2006 (Ex. 27).  Mr. Pellechio answered all specific questions within the scope of the deposition notice, all that is required by Fed. R. Civ. P. 30(b)(6).  As to the questions that plaintiffs claim Mr. Pellechio was unable to answer, NPC explained that these questions were in the nature of follow-up, not directly within the imprecise scope of the deposition notice.[36]  *See Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000) ("[I]f the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem.").  Nonetheless, NPC provided responses to those questions, *see* Letter from Katharine Latimer to Bart Valad, Dec 11, 2006 (Ex. 28), and offered several alternatives to facilitate plaintiffs obtaining sworn testimony:

> We are willing to have Mr. Pellechio answer the five questions addressed in the correspondence as written errata to his deposition.  Alternatively, we can make a NPC representative available to answer on the record those five specific questions, pursuant to a new deposition notice.

---

[36]  The deposition notice requested someone to speak on, *inter alia,* "Design, implementation, and maintenance of computer systems within Corporation," and "Backup procedures."  Pls.' "Amended Notice of Taking Deposition", Sept. 20, 2006, at 2 (Ex. 33).

Letter from Katharine Latimer to Bart Valad, Jan. 4, 2007, at 1 (Ex. 29).  Plaintiffs rejected NPC's offer.  Letter from Bart Valad to Katharine Latimer, Jan. 9, 2007, at 1 (Ex. 30).

At his deposition, Dr. Hoffman produced a list of twenty persons whom he testified were "involved with" the clinical trials and animal testing.  In response to plaintiffs' contentious letter of Dec. 11, 2006, Letter from Russell Beatie to Gary Rubin (Ex. 31), NPC confirmed that these persons were in fact "responsible" for the clinical trials.[37]  Letter from Katharine Latimer to Pat Flynn, Dec. 14, 2006 (Ex. 32).  Further, Dr. Hoffman testified at great length precisely how the corporate structure of the Oncology Business Unit operates.  *See, e.g.,* Transcript of Hoffman Deposition, December 1, 2006 ("Hoffman Dep.") at 39:7-14 (excerpts attached as Ex. 34) ("So it represents a business unit, it represents different functions within that business unit, it represents different functions within the unit at that time, and it represents reporting relationships within the unit.").  In short, he fulfilled his obligations as a 30(b)(6) witness.[38]

NPC does not dispute the PSCs right to take depositions of NPC, but Rule 30(b)(6) requires specificity of subject matter so that the witness can be prepared to answer questions reasonably within that scope.  Plaintiffs should not be permitted to obtain cost-free discovery by asking questions beyond the scope of a witness's designated topics, then relying on the witness's inability to answer those extraneous questions to seek sanctions or additional testimony on topics still not reasonably specific.  Plaintiffs' request for relief should be denied.

---

[37]  Plaintiffs themselves have shifted their terminology as to what information they seek from a witness: The Rule 30(b)(6) notice asks for the person "having responsibility for all phases of " the clinical trial; their follow-up letter asks for a person "in charge of the clinical investigations" (Beatie 12/11/2006 Letter, which misstates what the deposition notice requested from a witness); and their brief speaks of "persons supervising the testing of the drugs," (Pls. Mot. at 8), and "persons supervising the clinical trials of the drugs".  Pls.' Mot. at 9.

[38]  During the deposition, Mr. Beatie insistently attempted to ask questions well beyond the scope of the topics for which Dr. Hoffman had been designated, *see, e.g.,* Hoffman Dep. at 64:8-11 ("If one of your marketed products has therapeutic reactions, which are not reflected in the product literature does NPC have a policy for directing that kind of information?"); Hoffman Dep. at 26:7-9 ("Would it be fair to say

**XX. NPC HAS APPROPRIATELY DESIGNATED DOCUMENTS AS CONFIDENTIAL**

Plaintiffs complain, for the first time, that NPC over-designated confidentiality of documents by applying the confidentiality legend at the bottom of each document produced. Pls.' Mot. at 18. This, they contend, places an "unnecessary and unjustified burden" on them because they must file documents under seal. *Id.* Their exemplar of this burden – the filing under seal of a published article – underscores plaintiffs' misconstruction of the actual burden, the nature of confidentiality designations in large cases, and the need for communication prior to filing motions to compel. Had plaintiffs approached NPC about the document attached as plaintiffs' Exhibit 21, NPC would have provided a clean copy to avoid plaintiffs having to file the document under seal – since the document is publically available.

NPC has already produced nearly four million of six million pages it estimates will be produced from its initial sweep on a rolling basis, and already has stated its intent to supplement its production. In order that parties in large-document-production cases maintain the pace of production, well-established discovery principles permit NPC to produce documents in precisely the way in which it is. *See* Manual for Complex Litigation, § 11.432, at 85 (4th ed. 2006) ("[W]hen the volume of potentially protected materials is large, an umbrella order will expedite production, reduce costs and avoid the burden on the court of document-by-document adjudication"); *see also Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1307-08 (11th Cir. 2001) (discussing the operation and efficacy of umbrella protective orders); *Howes v. Ashland Oil, Inc.*, No. 87-5939, 1991 WL 73251, at *3 (6th Cir. May 6, 1991) (umbrella (or blanket) protective orders, "greatly expedite the flow of discovery material while affording protection against unwarranted disclosures") (Ex. 35). In the absence of such an order,

that a Phase I clinical trial was primarily devoted to determining safety for use in humans?").

NPC would be required to establish confidentiality on a document-by-document basis.

Plaintiffs can challenge the confidentiality designation of any specific documents they believe do not warrant such protection, as they have with their exemplar – not by filing a motion to compel but rather by providing NPC with a list of those documents they challenge. If, after meeting and conferring with NPC on such documents plaintiffs still believe the designation is improper, *then* they can seek the Court's assistance.

## XXI. PLAINTIFFS' REQUEST FOR ADDITIONAL INTERROGATORIES SHOULD BE DENIED

At 9:43 p.m. on January 4, 2007, the day before the PSC filed the instant motion, plaintiffs sent a letter requesting, for the first time, that NPC consent to answering twenty-five additional interrogatories, even though the CMO in this matter precludes plaintiffs from serving *any* additional interrogatories on NPC and despite the fact that plaintiffs had already served (and NPC had responded to) six more interrogatories than permitted by Fed. R. Civ. P. 33(a) (limiting parties to twenty-five interrogatories). Letter from Bart Valad to Katharine Latimer, Jan. 4, 2007 (Ex. 37). Plaintiffs have not demonstrated that any new interrogatories will not be unreasonably cumulative, seek information obtainable from other sources or already available to plaintiffs, or be unduly burdensome to defendant. *See* Fed. R. Civ. P. 33(a); Fed. R. Civ. P. 26(b)(2) (setting forth the principles governing whether additional interrogatories should be allowable). In fact, plaintiffs have sent NPC four proposed interrogatories; each was virtually identical to document requests plaintiffs served within the past week. *See* Letter from Bart T. Valad to Katharine Latimer, Jan. 10, 2007 (enclosing interrogatories) (Ex. 36).[39] Accordingly, the Court should deny plaintiffs' request for leave to serve additional interrogatories on NPC.

---

[39] *Compare* PSC's First Set of Interrogatories, Nos. 3-4 (Ex. 38) *with* PSC's First Request for Production of Documents, Nos. 1-4 (Ex. 39); *compare* PSC's First Set of Interrogatories, Nos. 1-2 *with* PSC's Second Request for Production of Documents, Nos. 1, 3 (Ex. 40).

## **CONCLUSION**

For the foregoing reasons, the Court should deny all relief sought by plaintiffs in the

Motion.

Respectfully submitted,

January 16, 2007                             /s/ Katharine R. Latimer
                                    Joe G. Hollingsworth
                                    Katharine R. Latimer
                                    Donald W. Fowler
                                    Robert E. Johnston
                                    SPRIGGS & HOLLINGSWORTH
                                    1350 I Street, N.W., Ninth Floor
                                    Washington, DC 20005
                                    (202) 898-5800
                                    (202) 682-1639 (fax)

                                    *Attorneys for Defendant*
                                    *Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 16th day of January 2007 served a true and correct

copy of the foregoing NOVARTIS PHARMACEUTICALS CORPORATION'S

MEMORANDUM IN OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S

MOTION TO COMPEL NOVARTIS DISCOVERY RESPONSES, by operation of the Court's

Electronic Case Filing System, on Plaintiffs' Liaison Counsel:

C. Patrick Flynn
Flynn & Radford
320 Seven Springs Way, Suite 150
Brentwood, TN 37027
(615) 370-9448

                                                /s/ Katharine R. Latimer
                                                Katharine R. Latimer